**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————

UNITED STATES of AMERICA, et al. *ex rel.*
URI BASSAN

                       Plaintiffs and Relator,

   -against-

                                        No. 1:15-cv- 4179 (CM)

OMNICARE, INC.; CVS HEALTH CORP.,

                       Defendants

———————————————————————

## MEMORANDUM DECISION AND ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS

      This is a *qui tam* False Claims Act ("FCA") action originally brought in June 2015 by relator Uri Bassan on behalf of the federal government, 29 states, and the District of Columbia against Omnicare, Inc., a long-term pharmacy. After several years of investigation, the United States intervened in the action in late 2019, filing a complaint against Omnicare and CVS Health Corp., which had completed its purchase of Omnicare in August 2015. The individual states have declined to intervene.

      At bottom, both Bassan and the government allege that between 2010 and 2018, Omnicare consistently dispensed prescription drugs to individuals living at long-term residential facilities that were not supported by valid prescriptions. Omnicare allegedly dispensed drugs based on prescriptions that had expired, had run out of refills, or were otherwise invalid. Although the drugs were dispensed illegally (i.e., without a valid prescription), Omnicare still submitted claims for reimbursement to several federal healthcare programs. These submissions for reimbursement are alleged to have contained false information in violation of the FCA. In total, the government

alleges that Omnicare dispensed drugs based on invalid prescriptions to potentially tens of thousands of individuals living at more than 3,000 residential facilities. (Gov't Compl., Dkt. No. 17 at ¶¶ 146, 149).

Presently before the Court are three motions to dismiss: (1) Omnicare's motion to dismiss the government's intervenor complaint; (2) Omnicare's motion to dismiss Bassan's complaint (primarily its remaining state-law claims); and (3) CVS's motion to dismiss for two reasons additional to the ones stated in Omnicare's motions. For the reasons that follow, all three motions are denied.

## I.   Background

### A.  Parties

The plaintiffs are the United States of America and the states upon whose behalf Bassan originally filed his complaint. Relator Uri Bassan is a pharmacist who previously worked as the Pharmacist-in-Charge at an Omnicare pharmacy in Albuquerque, New Mexico.

Defendant Omnicare is a Delaware corporation that has its principal place of business in Ohio. Omnicare is the nation's largest provider of pharmacy services to long-term care facilities – facilities like nursing homes and assisted-living facilities. Omnicare employs around 13,000 employees and operates approximately 160 pharmacies across 47 states. It dispenses tens of millions of prescription drugs to residents of long-term care facilities each year. During the relevant period (2010–2018), Omnicare submitted over 35 million claims seeking payment for drugs dispensed to Medicare beneficiaries residing in assisted-living facilities, alone.

Defendant CVS Health Corporation owns thousands of retail pharmacies throughout the United States. CVS purchased Omnicare for approximately $12.7 billion in mid-2015 and began overseeing its operations shortly thereafter.

### B. False Claims Act

The False Claims Act permits private citizens to file *qui tam* actions as "relators" to recover damages for fraud on behalf of the United States. "[W]hile the False Claims Act permits relators to control the False Claims Act litigation, the claim itself belongs to the United States," meaning that the federal government can intervene in any *qui tam* action filed on its behalf. *United States ex rel. Bilotta v. Novartis Pharms. Corp.*, 50 F. Supp. 3d 497, 508 (S.D.N.Y. 2014) (quoting *United States ex rel. Mergent Servs. v. Flaherty*, 540 F. 3d 89, 93 (2d Cir. 2008)). If the government decides to intervene, then it "shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the person bringing the action." 31 U.S.C. § 3730(c)(1). Courts have interpreted this to mean that "by automatic operation of the statute, the Government's complaint in intervention becomes the operative complaint as to all claims in which the government has intervened." *Bilotta* 50 F. Supp. 3d at 511–12 (quoting *United States ex rel. Sansbury v. LB & B Associates, Inc.*, 58 F. Supp. 3d 37, 47 (D.D.C. 2014)).

Relators are entitled to recover a portion of the damages owed to the United States if the action is ultimately successful. If the government declines to intervene, the relator is entitled to between 25 to 30 percent of any recovery he or she can obtain. 31 U.S.C. § 3730(d)(2). If the government does intervene and takes over in prosecuting the case, the relator can still receive between 15 and 25 percent of any recovery the government obtains. *Id*. at § 3730(d)(1).

Enacted in 1863, the FCA "was originally aimed principally at stopping the massive frauds perpetrated by large contractors during the Civil War." *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 1996 (2016) (quoting *United States v. Bornstein*, 423 U.S. 303, 309 (1976)). Although the Act has since been amended several times, "its focus remains on those who present or directly induce the submission of false or fraudulent claims" to the government. *Ibid*.

The Act imposes liability on several types of falsity. First, it prohibits "factually" false claims – where the party submitting the claim provides "an incorrect description of the goods and services provided or a request for reimbursement for goods and services never provided." *United States ex rel. Kester v. Novartis Pharms. Corp.*, 23 F. Supp. 3d 242, 260–61 (S.D.N.Y. 2014) (citation omitted). Second, it prohibits "legally" false claims – where a party submits a claim that contains a statement averring compliance with a federal statute or regulation when, in fact, the party was not complaint. *See United States ex rel. Grubea v. Rosicki, Rosicki & Assocs., P.C.*, 318 F. Supp. 3d 680, 699 (S.D.N.Y. 2018). Third, the Act imposes liability where a party "knowingly makes . . . a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." These last set of claims are known as "reverse false claims" because it imposes liability for failure to pay money owed *to* the government, rather than for obtaining money *from* the government. *See United States ex rel. Foreman v. AECOM*, 454 F. Supp. 3d 254, 268 (S.D.N.Y. 2020). The government alleges the defendants violated the FCA based on all three theories of liability.

**C. Allegations**

As the government's complaint is the operative complaint for purposes of the federal claims in this action, the overview of the allegations against the defendants are taken from it.

1. <u>Federal Law Permits Drug Reimbursements Only for Drugs Dispensed Pursuant to Valid Prescriptions, and all Information Submitted for Reimbursement Claims Must be Accurate</u>

Federal law defines a prescription drug as one that "is not safe for use except under the supervision of a practitioner licensed by law to administer such drug." 21 U.S.C. § 353 (b)(1). Such drugs cannot be dispensed without a valid prescription, and federal law prohibits reimbursement for dispensations not supported by a valid prescription. The statutes and regulations

4

guiding the three federal programs relevant to this suit: Medicare, Medicaid, and TRICARE (together, the "Federal Healthcare Programs"), all prohibit reimbursement for prescription drugs dispensed without a valid prescription. *See, e.g.,* 42 C.F.R. §§ 423.104(h); 440. 120(a) (Medicare); 42 U.S.C. §§ 1395w-102(e); 1396d(a) (12) (Medicaid); 32 C.F.R. § 199.9(a)(4) (TRICARE).

The crux of any FCA action is the false claim. Generally, whenever a pharmacy dispenses a drug for a beneficiary of any of these Federal Healthcare Programs, it will file a claim with the Program (either directly or indirectly through a third-party) to obtain reimbursement for the portion of the drug not paid out-of-pocket by the beneficiary.

### Medicare

Medicare beneficiaries receive prescription drug benefits through the Part D program, which is administered by private companies known as "Part D sponsors." Pharmacies like Omnicare submit "prescription drug event" data ("PDE") to Part D sponsors any time a prescription drug is dispensed. PDE data contains information such as the drug's name, its prescriber, how the prescription was transmitted to the pharmacy, the number of times the prescription was filled, and the quantity dispensed. The Part D Sponsor then submits the pharmacy's PDE data to the Centers for Medicare and Medicaid Services ("CMS"), to obtain reimbursement for the pharmacy. Courts have long held that pharmacies' "PDEs, if they are alleged to contain false or inaccurate data, are false claims for purposes of the FCA." *United States v. TEVA Pharms. USA, Inc.*, No. 13-cv-3702 (CM), 2016 WL 750720, at *25 (S.D.N.Y. Feb. 22, 2016); *cf United States ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746, 750 (3d Cir. 2017); 42 C.F.R. § 423.505(k)(3) (requiring "claims data generated by a related entity, contractor, or subcontractor of a Part D plan sponsor" to be accurate).

### Medicaid

Medicaid is a joint federal-state program that provides healthcare benefits for certain groups, primarily the poor and disabled. The federal government provides a portion of each state's Medicaid payments, but the programs are administered state-by-state. The federal Medicaid statute requires each participating state to implement plans containing specified minimum criteria for coverage and payment of claims. *See, e.g.,* 42 U.S.C. §§ 1396, 1396a(a)(13), 1396a(a)(30)(A). Like with Medicare, Medicaid coverage extends only to "prescribed drugs." 42 U.S.C. § 1396d(a)(12).

Whenever a Medicaid beneficiary submits a prescription drug claim to a pharmacy, the pharmacy dispenses the drug and also submits the claim to Medicaid. The claim contains information like the date of the prescription, the number of refills authorized, how the prescription was transmitted to the pharmacy, the quantity of the drug prescribed, and the amount claimed for reimbursement. Medicaid providers like pharmacies must sign enrollment agreements with their state programs that certify their compliance with all state and federal Medicaid requirements. These agreements typically require that the information the provider submits for reimbursement complies with all applicable state and federal laws and regulations. Requests for reimbursements submitted to Medicaid qualify as "claims" under the FCA. *See Kester*, 23 F. Supp. 3d at 260.

### *TRICARE (formerly CHAMPUS)*

TRICARE is part of the United States military's healthcare system and provides prescription drug benefits to members. Like Medicare, whenever a TRICARE beneficiary obtains a prescription through a pharmacy, the pharmacy submits an electronic claim to a Pharmacy Benefit Manager ("PBM") for that event. The record – called TRICARE Encounter Data ("TED") – contains information like the prescriber's identity, the date of the prescription, the number of authorized refills, etc. The TED is then submitted to TRICARE, which authorizes the PBM to pay

the pharmacy for the claim through government funds. All pharmacies that provide services to TRICARE beneficiaries are required to comply with its program requirements, including its anti-abuse provisions, which prohibit "misrepresentations of dates, frequency, duration, or description of services rendered, or of the identity of the recipient of the services or the individual who rendered the services." 32 C.F.R. § 199.9(c)(6).

    2.  <u>Long-Term Residential Facilities and Omnicare's Alleged Lack of Training</u>

Omnicare pharmacies dispense and deliver prescription drugs to residents of long-term care facilities – facilities like nursing homes, assisted-living facilities, and skilled nursing facilities. These facilities can be tiered based on the level of care they provide to their residents. At the highest level are skilled nursing facilities ("SNFs"), which require medical care to be available for residents 24-7. SNFs have a doctor on staff at all times and function not unlike hospitals. Because they provide around-the-clock care, some states permit pharmacies to dispense prescription drugs to residents based on a prescriber's "chart order" which is consistently reviewed and signed by the SNF's attending physician. These "chart orders" typically do not specify the total quantity of the drug prescribed or the number of refills authorized because they are made with the understanding that there will be a physician available 24-7 to monitor a patient's intake of the drug. They are considered valid prescriptions in the SNF setting, meaning that pharmacies servicing SNFs are sometimes permitted to refill prescriptions without a set quantity or a set number of refills allowed.

However, the allegations against Omnicare do not concern its conduct at SNFs, but at "unskilled" residential facilities that do not offer around-the-clock medical care. These facilities include assisted-living facilities ("ALFs") and independent living facilities. Most importantly, in regard to drug prescriptions, individuals living in unskilled residential facilities are treated like individuals who reside at home – they must schedule visits with their own doctors to obtain

prescriptions. For the most part, such prescriptions are limited, either by time or by quantity, and must be re-upped if they expire. For example, state statutes provide that prescriptions expire after a certain period of time – typically one year. *See, e.g.*, N.Y. Comp. Codes R. & Regs. Tit. 18 § 505.3 (six months); Mich. Admin. Code R 338.479b (one year); 49 Pa. Code § 27.18 (one year); N.J. Admin. Code § 13:39-7.3 (one year); Ill. Admin. Code tit. 68 §§ 1330.500, 1330.520 (one year); Utah Code R 156-17b-612(9) (one year).

A major aspect of the government's allegations is that Omnicare treated prescriptions for patients living at unskilled facilities as though they were meant for patients at SNFs, and consistently refilled prescriptions without ever verifying or confirming whether the prescription had expired or was otherwise invalid. In the government's words, "Omnicare failed to put in place adequate systems, procedures, and training to ensure that its pharmacies fulfilled their core obligations to (i) only dispense drugs that are supported by legally valid prescriptions; (ii) accurately track when those prescriptions expire; and (iii) obtain new prescriptions when necessary." (Compl. at ¶ 104).

According to the government, Omnicare pharmacists were under enormous pressure to process as many prescriptions as they could, often dispensing between 400 to 600 prescription orders per day. (Compl. at ¶¶ 107–09). But Omnicare's pharmacies were understaffed to handle the workload, and managers exerted extreme pressure upon line-level pharmacists to process prescriptions as fast as possible.

Despite these pressures, Omnicare did not adequately train its pharmacists on how to handle their dispensing obligations. Although pharmacists had to navigate multiple regulations when dispensing drugs at unskilled residential facilities, Omnicare effectively left its employees to learn on the job, often without the training necessary on how to process the high volume of

prescriptions they faced daily. Omnicare failed to train or guide pharmacy staff on how to track prescriptions at unskilled residential facilities to ensure that they were timely renewed once they expired or were exhausted. This precipitated the illegal conduct at issue: "rolling over" expired and exhausted prescriptions and continuing to dispense the drugs without a valid prescription.

    3.  <u>Dispensations Without Valid Prescriptions</u>

The government alleges that Omnicare dispensed drugs unsupported by valid prescriptions in three distinct ways: through its OmniDX dispensing system, through its "cycle fill" dispensing option, and through its Oasis dispensing system. Fundamentally for all three theories, Omnicare manipulated its systems by manipulating certain fields to allow dispensations to automatically occur even after a prescription had expired. Omnicare would then assign a new prescription number to the expired orders and just continue dispensing – a process Omnicare called "rolling over" a prescription.

*OmniDX*

Whenever a new prescription arrives for an individual living at a long-term care facility serviced by Omnicare, an Omnicare entry technician is supposed to enter the prescription's information into one of two Omnicare dispensing systems: OmniDX or Oasis. Necessary information includes the drug's name and dosage, the prescription date, the prescriber's name, and any specific instructions associated with the prescription. The entry technician was also supposed to enter the total prescribed quantity – either in the total number of pills that could be dispensed (i.e., 200 pills) or the total number of refills allowed under the prescription (i.e., 5 refills).

Both the OmniDX and Oasis systems contained a setting that corresponded to whether prescriptions could be automatically refilled. In OmniDX, it was called "Retirement," which distinguished between whether the facility Omnicare was servicing was a "retirement" community

like an ALF or if it was a more comprehensive healthcare facility like an SNF. If the facility was an unskilled residential facility that did not provide around-the-clock care, the entry technician was supposed to set the field to "Y" for yes. If the facility was a SNF, the field was supposed to be set to "N" for no.

The "Retirement" setting guided how other fields behaved – most critically, how refills were processed. When the field was set to "Y," the OmniDX system required pharmacy staff to manually enter a number in the "Refills Allowed" field, and the system would decline to process the prescription without a number entered into that field. Each time a prescription was refilled, the "Refills Allowed" field would decrease by one, and once the number hit zero, the system would alert Omnicare staff that a new prescription was required before any more drugs could be dispensed. But if the "Retirement" field was set to "N" to indicate an SNF or otherwise high-level-care facility, the "Refills Allowed" field auto-populated to an artificially high number. This was based on the understanding that at SNFs, prescriptions could be continually dispensed because residents always had an on-staff physician to monitor them if necessary.

For example, for Medicare Part D patients, the auto-populated number when the field was set to "N" was 99, meaning that unless the number was manually overridden, Omnicare would automatically refill prescriptions up to 99 times without the system ever alerting staff that a new prescription was necessary. More critically, even after the automatically populated number of refills had run out (i.e., the 99 had gone all the way down to 0), Omnicare would sometimes allow the prescription to "roll over" by "automatically generating a new prescription number and resetting the default number of allowable refills." (Compl. at ¶ 132).

The "Retirement" field also determined how OmniDX tracked a prescription's expiration date. The system typically tracked expiration dates through the "RX Issue Date" field, which was

the date that the prescription was first filled. In accordance with state laws, once the statutory time

for a valid prescription had passed, the system would alert pharmacy staff that a new prescription

was required. But if the "Retirement" field was set to "N," after the prescription's expiration date,

the system would automatically generate a "new order number (as if a new prescription had been

obtained), and the RX Issue Date field automatically changed to the new fill date." (Compl. at ¶

134). This permitted the system to continue dispensing drugs long after the original prescription

had expired.

*Cycle Fill*

Facilities serviced by OmniDX also had the option to "cycle fill" prescriptions. In contrast

to "demand" dispensing, in which Omnicare refilled a prescription only after the facility makes a

specific request, facilities that utilized the "cycle fill" option received deliveries for multiple drugs

based on a predetermined schedule. According to the government, prescriptions that were set to

be "cycle filled" were automatically programmed in OmniDX to "roll over" – meaning that they

were automatically refilled, regardless of whether the prescription had expired or not. (Compl. at

¶ 163). Although Omnicare's written policies required staff to obtain confirmation from the facility

that the residents whose prescriptions were being refilled were actually out of medication or

otherwise needed it, this typically did not occur. Instead, the prescriptions were simply refilled on

a regular cycle without review. For example, one email from an Omnicare of Chandler, Arizona

employee stated that "The only request from the facility will be the initial new order for a particular

medication and this will be sent to get the resident enough days to cycle fill. Then once the cycle

is due, the med will be automatically refilled each month until someone from the facility

[discontinues] the med." (Compl. at ¶ 169). According to the government, Omnicare's failures to

obtain the necessary authorizations/reviews to re-up cycle fill prescriptions were prevalent across the country.

*Oasis*

Omnicare's Oasis system was similarly manipulated to automatically dispense invalid refills. Like the "Retirement" field in OmniDX, Oasis had a field called "Prescribed Quantity Required," which corresponded to whether the serviced facility required a specific total quantity of medications prescribed (i.e., unskilled facilities) or whether a specific quantity was not required because it had around-the-clock care (i.e., SNFs). In Oasis, if the "Prescribed Quantity Required" was set to "Y," Omnicare staff needed to enter the total quantity of drugs prescribed or the authorized refills per order for the system to process the prescription. And like OmniDX, once the number of refills allowed were exhausted, Oasis prevented additional dispensations without a new prescription. But if the field were set to "N," then Oasis did not require Omnicare staff to enter any specific quantity allowed or refills permitted. Instead, Oasis would "assign a new order number as if a new prescription had been received" whenever the prescription needed to be refilled, "and Omnicare pharmacy staff would dispense the drug indefinitely without receiving notice that they needed to contact the patient's treating physician to obtain a new prescription." (Compl. at ¶ 138).

*Summary*

The allegations brought by the United States against Omnicare can be summarized as follows: (1) the OmniDX theory – focusing on the "Retirement" setting in the system and how it was often improperly set to "N" to allow for continual refills; (2) the cycle fill theory – focusing on how OmniDX's cycle filled orders by routinely refilling prescriptions that had expired; and (3) the Oasis theory – focusing on how the "Prescribed Quantity Required" setting in the Oasis system was often improperly set to "N" to allow for continual refills.

All of these actions resulted in "Omnicare pharmacies throughout the country routinely dispens[ing] prescription drugs to Federal Healthcare Program beneficiaries residing in [assisted-living facilities] and other Residential Facilities based on stale, invalid prescriptions." Omnicare then "billed Government Payors for these illegal drug dispensations," submitting false claims in the process. (Compl. at ¶ 142). In total, the government alleges that Omnicare submitted false claims based on illegal dispensations for residents in over 3,000 unskilled residential facilities based on the various theories described. (Compl. at ¶¶ 152, 167, 158). It has attached exhibits detailing the names and locations of each of these facilities. It has also attached an exhibit detailing over 4,000 specific claims submitted from various Omnicare facilities that are alleged to be false.

### D. Procedural History

Bassan filed his *qui tam* complaint under seal against Omnicare on June 1, 2015. It alleges a total of 32 counts: two under the federal FCA, and 30 under the laws of 29 states and the District of Columbia. Bassan's state-law claims allege substantially the same activity described in the government's intervenor complaint; he simply brought additional claims under state law.

After conducting its investigation, the federal government filed an intervenor complaint in both cases on December 17, 2019. The Government's complaint alleges five counts: three claims arising under the FCA (Counts 1–3), one claim of "payment by mistake of fact" (count 4) and one claim of "unjust enrichment" (count 5). The states implicated in Bassan's complaint have all declined to intervene.[1]

---

[1] In a December 11, 2019 letter, 28 of the 30 state-level entities implicated in Bassan's complaint notified this Court of their decision to decline to intervene in the action. On March 24, 2020, one of the two remaining state-level entities, Washington D.C. notified this Court that it also declined to intervene. The remaining state, Indiana, has not filed anything with this Court. Its silence will be interpreted as a decision to decline intervention, given that all deadlines to file amended complaints have passed.

During the interim of the government's investigation, another set of relators filed a *qui tam* complaint under seal against Omnicare and CVS in the District of Utah in early 2017. That case was later transferred to this Court, which has already dismissed that later-filed related action pursuant to the FCA's first-to-file bar. *See United States ex rel. Mohajer v. Omnicare, Inc.*, Case No. 17-cv-4176 (CM), 2021 WL 950024 (S.D.N.Y. Mar. 12, 2021).

Now before the Court are three motions to dismiss: (1) Omnicare's motion to dismiss the government's intervenor complaint; (2) Omnicare's motion to dismiss Bassan's complaint (primarily its remaining state-law claims); and (3) CVS's motion to dismiss for two reasons additional to the ones stated in Omnicare's motions – that the government and Bassan have failed to allege veil-piercing or CVS's direct participation in the Omnicare scheme. For the reasons that follow, all three motions are denied.

## II.  Discussion

### A.  As a Procedural Matter, the Government's FCA Claims Supersede Bassan's

Since the federal government has intervened in this action, its complaint is now the operative one for all FCA claims. 31 U.S.C. § 3730(c)(1); *Bilotta* 50 F. Supp. 3d at 511–12. Bassan agrees, conceding that "the Government's claims duplicate and supersede Bassan's FCA claims, so the Complaint-in-Intervention is now the operative pleading." (Dkt. No. 80 at pg. 8). Omnicare urges the Court to dismiss Bassan's federal claims based on this concession.

Although some courts have dismissed relators' FCA counts after government intervention, *see United States ex rel. Feldman v. City of New York*, 808 F. Supp. 2d 641, 649 (S.D.N.Y. 2011), the FCA provides that "If the Government proceeds with the action . . . [relators] shall have the right to continue as a party to the action, subject to" certain limitations. 31 U.S.C. § 3730(c)(1). The statute also provides mechanisms for the government to further limit the relator's participation in the action if it deems that "the person initiating the action would interfere with or unduly delay

the Government's prosecution of the case, or would be repetitious, irrelevant, or for purposes of harassment." *Id*. at § 3730(c)(2)(B). Thus, the statute clearly contemplates the continued involvement of relators in an FCA suit, and other courts have permitted relators to continue in a passive capacity after the government's intervention. *See, e.g., Bilotta*, 50 F. Supp. 3d at 513; *Sansbury*, 58 F. Supp. 3d at 47.

Ultimately, this procedural distinction makes no practical matter to Bassan, since, as relator, he will be entitled to between 15% to 25% of whatever amount, if any, is recovered by the government in this action. He will also be prohibited from independently pursuing his identical FCA claims if the government chooses to settle. *See* 31 U.S.C. § 3730(c)(2)(B). But Omnicare's motion to dismiss Bassan's superseded FCA claims is denied.

### B. Omnicare's Motion to Dismiss the Government's Complaint is Denied

The government's complaint alleges five separate causes of action. The first three arise under the FCA – two "conventional" fraud claims under 31 U.S.C. § 3729 (a)(1)(A) and (B), and one "reverse false claim" under § 3729(a)(1)(G). The government's other two claims are common-law claims – one for payment by mistake and one for unjust enrichment. Omnicare has moved to dismiss all five of these counts for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  For substantially the reasons articulated by the Government in its opposing brief, the motion is denied.

To survive a motion to dismiss for failure to state a claim, a plaintiff's complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Ibid*. (citing *Twombly*, 550 U.S. at 556). This standard is not difficult to meet, and a complaint will not be dismissed for failure to state a claim as long as a plaintiff has "nudged their claims across the line from conceivable to plausible." *Id*. at 570; *Iqbal*, 556 U.S. at 680.

However, "*Qui tam* complaints filed under the FCA, because they are claims of fraud, are subject to Rule 9(b)," which requires plaintiffs to meet a heightened pleading standard. *United States ex rel. Chorches for Bankruptcy Estate of Fabula v. Am. Med. Response, Inc.*, 865 F. 3d 71, 81 (2d Cir. 2017). Rule 9(b) provides that when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This ordinarily requires a description of (1) the specific statements that are alleged to be fraudulent; (2) the identity of the speaker; (3) where and when the statements were made; and (4) why the statements were fraudulent. *Chorches*, 865 F. 3d at 81.

1.  <u>The Government's First and Second Counts Plead FCA Claims with Particularity</u>

Counts one and two allege that Omnicare and CVS submitted claims for reimbursement that were both legally and factually false, in violation of 31 U.S.C. §§ 3729(a)(1)(A) and (B), which imposes liability on anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." Claims arising under these two sections are treated similarly, as the primary difference between the two is whether the claim itself is false, § 3729(a)(1)(A), or whether the a record or statement material to the claim was false, § 3729(a)(1)(B). *See United States ex rel. Pervez v. Beth Israel Med. Ctr.*, 736 F. Supp. 2d 804, 811 (S.D.N.Y. 2010); *cf United States v. Strock*, 982 F.3d 51, 58–59 (2d Cir. 2020).

*Legal Falsity*

Legal falsity can be express or implied. A claim is expressly false if a party avers that it is complying with a statute or regulation when, in actuality, it is not. *See Grubea*, 318 F. Supp. 3d at 699. A claim is impliedly false if a defendant "makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement." Liability attaches in such circumstances "if the omission renders those representations misleading." *Universal Health Servs., Inc.*, 136 S. Ct. at 1995.

The government alleges that defendants' claims to Medicare and Medicaid were expressly false because those claims require applicants to certify that the dispensations for which they were seeking reimbursement were made in compliance with federal law. For example, Medicare regulations require entities that submit PDE data to certify to "the accuracy, completeness, and truthfulness of the data," 42 C.F.R. § 423.505(k)(3). States require similar expressions of compliance to obtain Medicaid reimbursement. (Compl. at ¶¶ 50–51). The government also alleges that defendants' claims to TRICARE were impliedly false because Omnicare submitted claims without disclosing that the dispensation was made without a valid prescription. Obviously, the government would not have reimbursed for these claims had it known that they were dispensed without valid prescriptions.

Omnicare presents what can only be described as a novel reason why the Government's pleading is insufficiently particular. In Omnicare's view, the only regulation that prohibited the conduct alleged was a Medicare regulation providing that reimbursement can only be paid for drugs that "are dispensed upon a valid prescription." 42 C.F.R. § 423.104(h). The same regulation defines a "valid prescription" as "a prescription that complies with all applicable State law requirements constituting a valid prescription." *Id*. at § 423.100. However, Omnicare points out

that 42 C.F.R. §§ 423.100; 423.104(h) did not take effect until January 1, 2013, and insists that

any claim it submitted to Medicare before 2013 could not have been "false," because the limitation

that drugs could only be dispensed upon a "valid prescription" had not yet taken effect.

This argument affords no basis to dismiss the first and second claims in their entirety, for

several reasons.

First, the cited regulation pertains only to Medicare reimbursements, not to Medicaid or

TRICARE, which are encompassed by the more robust scheme alleged by the Government.

Second, the Government has sufficiently alleged that Omnicare's Medicare

reimbursements after January 1, 2013 were the product of false claims.

Third, I reject Omnicare's suggestion that it was perfectly legal to dispense drugs paid for

by Medicare without a valid prescription prior to 2013. That is not the case, as the Government

cogently argues. CMS regulatory guidance prior to the 2013 codification made it clear that, "Since

the inception of the Part D program, we have consistently maintained that drugs cannot be eligible

for Part D coverage unless they are dispensed upon prescriptions that are valid under applicable

State law." 76 Fed. Reg. 63,018, 63,059 (Oct. 11, 2011).

This policy – most clearly articulated in 42 C.F.R. § 423.104(h) – has long been reflected

in federal statutes other than the FCA. For example, the Federal Food Drug and Cosmetic Act

requires that a "prescription" drug

> shall be dispensed only (i) upon a written prescription of a practitioner licensed by
> law to administer such drug, or (ii) upon an oral prescription of such practitioner
> which is reduced promptly to writing and filed by the pharmacist, or (iii) by refilling
> any such written or oral prescription if such refilling is authorized by the prescriber
> either in the original prescription or by oral order which is reduced promptly to
> writing and filed by the pharmacist.

21 U.S.C. § 353(b)(1). This text has been in the statute since 1951. *See* Pub. L. No. 82-215, 65

Stat. 648, 649 (1951). Similarly, another statute – 42 U.S.C. § 1395w-102(e) – provides that a

"covered Part D drug" was one that "may be dispensed only upon a prescription." These laws are more than adequate to put any pharmacy on notice that it was prohibited from submitting claims for reimbursement without valid prescriptions. Omnicare's arguments to the contrary are meritless.

Despite this, Omnicare insists that many states actually permitted unskilled residential facilities to dispense drugs without a prescription specifying the quantity or number of refills allowed. Indeed, Omnicare dedicates a full three pages in its memorandum to citing these state laws.

But on closer inspection, the state laws do not all say what Omnicare says they say. For example, Omnicare cites to a Wyoming regulation for the proposition that drug orders to all long-term care facilities (including unskilled ones) need not specify drug quantities. Wyo. Admin. Rules 059.0001.15 § 4. But that regulation specifically provides that a "long term care facility" "*does not include* adult day care facilities, home health agencies, or assisted living facilities" – the very types of facilities where the government alleges that the illegal scheme charged in its complaint took place. *Id*. at § 4(a) (emphasis added). Omnicare cites to an Indiana statute for the same proposition; but the Indiana regulation provides that prescriptions made to any "hospital or other health care institution" must specify "the amount to be dispensed either in quantity or days" and "may not be refilled except in the manner designated on the prescription or drug order or by the authorization of the practitioner." Ind. Code §§ 25-26-13-2; 16-42-19-12. Certain other states even have statutory expiration dates for "chart orders," such that, even if the prescription did not need to specify a drug quantity, it would still need to be re-issued after a certain period of time – a regulation with which, according to the Government, Omnicare did not comply.  *See, e.g.,* Minn. R. 6800.3510 (twelve months); Neb. Rev. Stat. Ann. § 38-2870 (same).

More fundamentally, Omnicare's argument overlooks the government's allegation that Omnicare not only dispensed drugs after prescriptions expired, but also dispensed drugs for which there were no valid prescriptions to begin with. The government claims that Omnicare "filled medications based solely on receipt of a resident's Medical Administration Record ('MAR')," which was not a valid prescription and was not typically signed by a doctor. (Compl. at ¶ 180). It also alleges that Omnicare dispensed drugs based on "copies of medication lists/reports from the hospital or other healthcare facility where residents had stayed prior" to their current facility. (Compl. ¶ 181). These, too, were not valid prescriptions; yet "Omnicare pharmacies relied on these lists/reports to repeatedly dispense drugs." (*Ibid*.) The complaint alleges that Omnicare would even dispense drugs based on "faxes or verbal refill requests" from facilities, even "when there was no valid underlying prescription authorizing the fill." (Compl. at ¶ 182).

These allegations are more than sufficient to state a claim that the dispensations were illegal and so the claims submitted seeking reimbursement for them violated the FCA. If there are particular prescriptions that Medicare reimbursed after receiving a claim that turn out not to be false, owing to state law considerations, it will diminish the Government's recovery – but it does not warrant dismissal of the complaint.

*Factual Falsity*

The government also pleads with particularity that the claims Omnicare submitted were factually false – that they contained details about the drug's supposed prescriber, the number of refills allowed, and other assorted information that were wholly untrue because there was no underlying prescription at all to support the reimbursement. For example, prescriptions that were "rolled over" were wholly invalid, but Omnicare submitted reimbursement claims for them anyway, essentially fabricating the information included on the PDEs and other data submitted to

the government. The claims were factually false because all of the information contained within them were untrue since a real prescription did not exist.

Omnicare argues that the government fails to plead any false claims with particularity, but this is belied by the very description of the allegations that the Court has provided in this opinion. "Rule 9(b) does not require that every *qui tam* complaint provide details of actual bills or invoices submitted to the government." *Chorches*, 865 F.3d at 93. "The point of Rule 9(b) is to ensure that there is sufficient substance to the allegations to both afford the defendant the opportunity to prepare a response and to warrant further judicial process." *Id*. at 87. All that is required is that the complaint "provide[s] the defendant with enough details to be able to reasonably discern which of the claims it submitted are at issue." *Kester*, 23 F. Supp. 3d at 258.

The complaint outlines specific conduct observed by Omnicare employees, including how Omnicare consistently failed to distinguish between SNFs and unskilled facilities in processing orders at pharmacies using both the Oasis and OmniDX systems, (Compl. at ¶¶ 144, 158–61, 178), and how the "cycle fill" option was abused at specific locations. (Compl. at ¶¶ 169, 172). For even more detail, the government attached exhibits specifying the over 3,000 facilities where it alleges illegal conduct occurred, as well as over 4,000 specific claims to Medicare that it alleges were fraudulent. (Dkt. No. 17, Exhibits 1–5). Omnicare asserts that the government should have included similar exhibits detailing the specific claims to Medicaid and TRICARE that were also allegedly fraudulent; but, as this Court has held in the past, plaintiffs "need not submit sample claims for *each government program* on behalf of which they have brought suit." *TEVA*, 2016 WL 750720 at *15. "Providing sample claim information for one program . . . is a sufficient basis for the Court to infer that similar claims were submitted to the other named government programs."

*Ibid.* The claims the government proffers are "representative of those arising from the fraudulent scheme" in general. *Kester*, 23 F. Supp. 3d at 259.

"Rule 9(b) is 'designed to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit.'" *Chorches*, 865 F. 3d at 86 (quoting *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 25 (2d Cir. 2016)). The government's complaint more than satisfies this purpose.

As a final matter, Omnicare argues that the complaint fails to plead that Omnicare "knowingly" submitted false claims for reimbursement. But this, too, is belied by the facts alleged in the complaint. The complaint states numerous times that Omnicare and CVS executives knew that they could not dispense drugs without valid prescriptions, that they knew many of their facilities did so anyways, but that this conduct continued even after they were alerted to that fact. (Compl. at ¶¶ 97–98, 188–233). Omnicare officials would have been informed about these violations as a result of multiple internal and third-party audits that occurred periodically at locations across the country. They also knew of them because numerous state boards of pharmacy conducted investigations that found that Omnicare facilities were not in compliance with state law regarding dispensations. (Compl. at ¶¶ 197–201). Nevertheless, Omnicare – and CVS after it took over – continued submitting claims knowing that their dispensations were illegal. "Rule 9(b) permits knowledge to be averred generally." *Strock*, 982 F. 3d at 66 (quoting *O'Brien Nat'l Prop. Analysts Partners*, 936 F. 2d 674, 676 (2d Cir. 1991)). The government has met this burden. The complaint pleads the first two FCA claims with particularity.

2.   <u>The Government's Third Count States an FCA "Reverse False Claim"</u>

Count Three of the government's complaint alleges a violation of 31 U.S.C. § 3729(a)(1)(G), which states in relevant part, that a defendant is liable if it "knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." This is referred to as a "reverse false claim," because it imposes liability for failing to pay to the government money that a party owes, rather than from fraudulently obtaining them from the government. "[T]he financial obligation that is the subject of the fraud flows in the opposite of the usual direction." *United States ex rel. Kane v. Healthfirst, Inc.*, 120 F. Supp. 3d 370, 379 (S.D.N.Y. 2015) (citation omitted). The government's theory under this claim is that Omnicare failed to *repay* the funds that it received from the false reimbursement requests it submitted to the Federal Healthcare Programs.

The parties principally contest whether the government has adequately pled that Omnicare had an "obligation to pay" with which it failed to comply. The FCA defines an "obligation" as "an established duty, whether or not fixed, arising from . . . statute or regulation, or from the retention of an overpayment." 31 U.S.C. § 3729(b)(3).

The government cites 42 U.S.C. § 1320a-7k(d)(4)(B) – passed as part of the Affordable Care Act – which requires entities to return any overpayments received from Medicare or Medicaid within 60 days after the overpayment is identified. (Compl. at ¶ 24). The provision defines "overpayment" as "any funds that a person receives or retains under subchapter XVIII [Medicare] or XIX [Medicaid] to which the person, after applicable reconciliation, is not entitled under such subchapter." "Any overpayment that an entity keeps for more than 60 days "is an obligation . . . for purposes of section 3729" of the FCA. *Id*. at § 1320a-7k(d)(3). The text of these provisions is clear; through it, "Congress stated that funds received or retained under [Medicare and] Medicaid

would constitute overpayments for the purposes of 31 U.S.C. § 3729(a)(1)(G)." *Kane*, 120 F. Supp. 3d at 396; *see also United States ex rel. Ormsby v. Sutter Health*, 444 F. Supp. 3d 1010, 1056 (N.D. Cal. 2020).

Omnicare argues that the government failed to plead that there had been any "applicable reconciliation," and so any funds Omnicare received from its allegedly fraudulent claims were not "overpayments" as contemplated by the statute and were not retained in knowing violation of any obligation. This argument is baseless. CMS has noted – and courts have held – that the "applicable reconciliation" modifier refers simply to "an event or events after which an overpayment can exist" and typically occurs at "the point when organizations submit their final data for the previous payment year." *United States ex rel. Kuriyan v. Health Care Servs. Corp.*, No. 16-cv-1148 (JAP) (KK), 2020 WL 8079811, at *8 (D.N.M. Sep. 8, 2020) (quoting *Contract Year 2015 Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs*, 79 Fed. Reg. 1918, 2001 (Jan. 10, 2014)); *Ormsby*, 444 F. Supp. 3d at 1061; *see also* 42 C.F.R. § 422.326(a).

For our purposes, there is no need to scrutinize the exact dates of payment submissions, because the complaint more than sufficiently alleges that Omnicare had notice of its violations and thus that it needed to repay the reimbursements it improperly received. The complaint alleges that Omnicare was put on notice of violations multiple times by internal, state, and other third-party audits, which were conducted throughout the relevant period. For instance, in as early as 2012, the Utah Division of Occupational and Professional Licensing found that Omnicare's Salt Lake City location was not in compliance with dispensing regulations – specifically, that the pharmacy "dispensed or otherwise distributed legend drugs beyond a year from the original order date." (Compl. at ¶ 198). Agencies in Missouri, Ohio, and New Mexico transmitted similar notices of

violation to Omnicare and CVS during the relevant period. (Compl. at ¶¶ 199–201). The complaint also details multiple internal and third-party audits that put Omnicare on notice that it was not allowed to keep the reimbursements it had received from their illegal dispensations. (Compl. at ¶¶ 202–14). The government has pleaded a "reverse false claim" with particularity.

As a last resort, Omnicare argues that the government's reverse false claim theory is duplicative of its other FCA claims, and so must be dismissed. It insists that the wrongful conduct alleged in the first two counts cannot be recast as a reverse false claim simply because Omnicare allegedly failed to return the money. If this were allowed, then Omnicare could be liable for double recovery for the same conduct – submission of the false claim and then the retention of the overpayment.

But the government is permitted to plead theories in the alternative, especially at this early stage of the litigation. If discovery demonstrates that Omnicare failed to *knowingly submit* false claims to the government for reimbursement – as Omnicare contends was the case – then it may not be liable for the two conventional FCA counts. However, if discovery also reveals that Omnicare improperly kept the reimbursements after the payments were determined to have been made in error, then the government's reverse false claim takes on independent significance, as Omnicare could still be liable based only on that theory of liability.

The case that Omnicare primarily cites for its position, *United States ex rel. Ortiz v. Mt. Sinai Hosp.*, was at the summary judgment stage of the litigation, not the motion to dismiss stage. 256 F. Supp. 3d 443 (S.D.N.Y. 2017). The defendants' motion to dismiss in that case was *denied*. *United States v. Mt. Sinai Hosp.*, No. 13-cv-4735 (RMB), 2015 WL 7076092, at *12–13 (S.D.N.Y. Nov. 9, 2015). If discovery reveals that there is no independent basis for imposing reverse-false-claim liability, then this count may very well be dismissed at the summary judgment stage as

duplicative. But when considering the pleadings, the government has sufficiently pled that 31 U.S.C. § 3729(a)(1)(G) can serve as an alternative and independent basis for liability. Omnicare's motion to dismiss this count is denied.

### 3.   The Government's Fourth and Fifth Counts Plead Common Law Claims

Counts four and five of the government's complaint alleges claims for payment by mistake and for unjust enrichment under federal common law. Omnicare's theory for dismissing these counts is simply that federal common law cannot be the basis for these causes of action after *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). This is incorrect. "[F]ederal law governs questions involving the rights of the United States arising under nationwide federal programs." *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726 (1979). The United States' rights under the FCA clearly arise under a nationwide federal program. Moreover, it is long established that the "Government by appropriate action can recover funds which its agents have wrongfully, erroneously, or illegally paid." *United States v. Wurts*, 303 U.S. 414, 415 (1938). "No statute is necessary to authorize the United States to sue in such a case. The right to sue is independent of statute." *Ibid*. (quoting *United States v. Bank of Metropolis*, 40 U.S. 377, 378 (1841)). Courts have consistently held that federal common law claims are available to the government and can coexist with FCA claims. *See, e.g., United States v. General Dynamics Corp.*, 19 F. 3d 770, 773 (2d Cir. 1994); *Bilotta*, 50 F. Supp. 3d at 539; *Ormsby*, 444 F. Supp. 3d at 1086.

The government can, therefore, pursue these causes of action. At the end of the day, there will be no double recovery; but its alternate theories of recovery for Omnicare's alleged misconduct are well pleaded at this preliminary stage.

### C.  CVS's Motion to Dismiss is Denied

CVS moves to dismiss all the counts asserted against it by the government for the same reasons as Omnicare. To that extent, its motion is denied, for the same reasons that Omnicare's motion was denied.

CVS advances two additional reasons why the Government's complaint should be dismissed as against it: that the government failed to allege any type of veil-piercing or that CVS directly participated in the allegedly unlawful scheme perpetrated by Omnicare.

The government concedes that its basis for holding CVS liable does not depend on a veil-piercing or alter-ego theory. (Dkt. No. 81 at pg. 36). However, its complaint more than sufficiently alleges that CVS directly participated in the scheme.

The complaint contains numerous specific allegations against CVS. For example, it states that, after CVS purchased Omnicare in mid-2015, it "assumed an active role in overseeing Omnicare's operations, including pharmacy dispensing practices and systems." (Compl. at ¶ 21). It further alleges that CVS became aware that Omnicare had been "rolling over" prescriptions without valid authorization "shortly after" it acquired Omnicare and "assumed control over Omnicare's Operations and Compliance departments." (Compl. at ¶ 186). "CVS was notified that Omnicare pharmacies were dispensing drugs to residents of ALFs and other Residential Facilities without valid prescriptions" and even "discussed" these problems with senior Omnicare management, but took no further substantive steps to address the problem. (*Ibid.*).

Even more specifically, the complaint alleges that in 2015, "CVS's Director of Regulatory Affairs was made aware" of a New Mexico Board of Pharmacy investigation that had alerted Omnicare and CVS of medications being dispensed without valid prescriptions, and that they were serious violations of state law. (Compl. at ¶ 8). Because CVS had just purchased Omnicare, "CVS

compliance staff were involved in responding to the investigations." (*Id*. at ¶ 201). This would have put CVS on notice of the illegal actions ongoing at Omnicare pharmacies, but it failed to take any steps to remedy the situation. The complaint also alleges that "in 2017, CVS's audit team conducted an audit of Omnicare's 'Revenue Process' that identified instances" where the cycle fill option would dispense drugs when the necessary "authorization form had not been obtained by pharmacies." (Compl. at ¶ 173). CVS's Vice President and Chief Audit Executive even "directed management to 'design and implement a monitoring program to assess pharmacy compliance with required refill authorizations,'" but illegal dispensations and fraudulent claims continued. (*Ibid*.).

Although "It is a general principle of corporate law . . . that a parent corporation . . . is not liable for the acts of its subsidiaries," *United States v. Bestfoods*, 524 U.S. 51, 61 (1998), it is also true that "the parent is directly liable for its own actions" if it "is directly a participant in the wrong complained of." *Id*. at 64 (citation omitted). Here, the allegations against CVS are more than sufficient to get the Government's complaint past a motion to dismiss. This is not an instance in which the government simply lumped together "defendants" without distinction. *See United States ex rel. Takemoto v. The Hartford Fin. Servs. Grp.*, 157 F. Supp. 3d 273, 281 (W.D.N.Y. 2016), or alleged that "All Defendants" were culpable "without specifically naming *any* Defendant, knowingly presented . . . false claims in violation of [the FCA]." *United States ex rel. Ahumada v. Nat'l Ctr. For Emp. of the Disabled*, 2013 WL 2322836, at *3 (E.D. Va. May 22, 2013) (emphasis added). Thus, CVS's reliance on these two cases is unavailing.

The government specifically alleged CVS's involvement in the scheme after it took over Omnicare's operations and compliance. This is enough to state a claim that CVS is liable. CVS's motion to dismiss is denied.

28

### D. Bassan's State-Law Claims are Stayed Pending the Resolution of the Government's FCA Claims.

Since the government's intervention means that its complaint is the operative one for the FCA claims, the only claims relevant for Bassan are the ones he brings on behalf of 29 states and the District of Columbia under those jurisdictions' FCA laws.

In its opposition to Omnicare's motion to dismiss these counts, Bassan asks the Court to stay the state-law FCA claims until the federal FCA claims are resolved. This is something that I have done in the past. *See TEVA*, 2016 WL 750720, at \*28. Relators in that case brought claims under the federal FCA, 29 state-law analogs, and three additional municipal-level analogs. *Id*. at \*10. Although the federal and local governments all declined to intervene in that action, I noted that it would be "In the interest of judicial economy and docket management" for the local claims to be "stayed until the federal FCA claims have been resolved." *Id*. at \*28. Moreover,

> If the federal claims are ultimately dismissed, this Court will decline to exercise jurisdiction over the several state and local claims and they can be adjudicated in fora where local laws are well known and frequently applied. If Relators prevail on the federal claims, we will address the resolution of these pendent claims as part of an overall resolution. However, there is no reason for this Court to spend a lot of time delving into the arcana of myriad (as in, more than 30) state and local false claims laws before the factual record in this case is developed and the federal claims are resolved one way or another. *Ibid*.

This rationale applies even more so in this case, where the federal government *has* intervened and whose federal claims now supersede the relator's. There is no reason for concurrent litigation led by two separate parties with two separate sets of counsel to continue, especially when this Court may decline to exercise supplemental jurisdiction over the state-law claims if the federal claims are later dismissed.

Accordingly, as in *TEVA*, I conclude that it would be in the interests of justice to deny Omnicare's motion to dismiss Bassan's state-law claims without prejudice to renewal until after the federal claims have been resolved. Bassan's state-law claims are stayed until then.

**Conclusion**

For the foregoing reasons, Omnicare's and CVS's motions to dismiss the FCA claims is denied. Omnicare's motion to dismiss relator Bassan's state-law claims is also denied, without prejudice to renewal after the federal claims are resolved.

The Clerk of the Court is respectfully directed to remove the motions at Dkt. Nos. 67, 69, and 71 from the Court's list of pending motions.

Dated: March 19, 2021

_____

Chief Judge

BY ECF TO ALL COUNSEL

30