**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA, *et al.*, *ex rel.* URI BASSAN,

Plaintiffs,

v.

OMNICARE, INC.,

Defendant.

UNITED STATES OF AMERICA,

Plaintiff,

v.

OMNICARE, INC. and CVS HEALTH CORP.,

Defendants.

Case No. 15-CV-4179-CM-VF

**CVS HEALTH CORPORATION'S RENEWED MOTION FOR DIRECTED VERDICT**

Enu Mainigi (*pro hac vice*)
Holly Conley (*pro hac vice*)
William Ashworth (*pro hac vice*)
Beth A. Stewart (*pro hac vice*)
David Randall J. Riskin (*pro hac vice*)
Benjamin Hazelwood (Bar No. 5001508)
Suzanne Salgado (*pro hac vice*)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, S.W.
Washington, DC 20024
(202) 434-5000

For matters in New York:
650 Fifth Avenue, Suite 1500
New York, NY 10019

*Attorneys for CVS Health Corporation*

# TABLE OF CONTENTS

ARGUMENT ....................................................................................................................3

I. The Law: The Government Must Establish Direct Involvement—Not Just Knowledge And Inaction—To Prevail Against CVS Health Corporation. ..........................3

II. The Evidence: The Government Has Not Established And Cannot Establish CVS Health Corporation's Direct Participation. ..................................................................8

A. The Record Refutes Any Finding of Direct Participation. ......................................8

B. The Government's Directed-Verdict Documents Do Not Establish Direct Participation. .............................................................................................11

CONCLUSION ...........................................................................................................13

# TABLE OF AUTHORITIES

## CASES

*Bastidas v. Good Samaritan Hospital*, 2014 WL 1022563 (N.D. Cal. Mar. 13, 2014)...............3, 8

*United States ex rel. Bartlett v. Tyrone Hospital, Inc.*, 234 F.R.D. 113 (W.D. Pa. 2006) ....................3, 4, 8

*United States ex rel. Dunlap v. Alaska Radiology Associates*, 2017 WL 6048167 (D. Alaska Mar. 31, 2017) ....................3, 8

*United States ex rel. Hockett v. Columbia/HCA Healthcare Corp*, 498 F. Supp. 2d 25 (D.D.C. 2007) ....................4, 7

*United States ex rel. Long v. SCS Business and Technical Institute*, 173 F.3d 870 (D.C. Cir. 1999) ....................7

*United States ex rel. Long v. SCS Business and Technical Institute*, 999 F. Supp. 78 (D.D.C. 1998) ....................6, 7

*United States ex rel. Martino-Fleming v. South Bay Mental Health Center, Inc.*, 2018 WL 4539684 (D. Mass. Sept. 21, 2018) ....................5

*United States ex rel. Martino-Fleming v. South Bay Mental Health Centers*, 540 F. Supp. 3d 103 (D. Mass 2021)....................4, 6

*United States ex rel. Nedza v. American Imaging Management, Inc.*, 2020 WL 1469448 (N.D. Ill. Mar. 26, 2020)....................3, 4, 8, 10

*United States ex rel. Polukoff v. St. Mark's Hospital*, 2016 WL 1449219 (M.D. Tenn. Apr. 13, 2016)....................3, 8

*United States ex rel. Schaengold v. Memorial Health, Inc.*, 2014 WL 6908856 (S.D. Ga. Dec. 8, 2014)....................3, 8

*United States ex rel. Schagrin v. LDR Industries*, 2018 WL 6064699 (N.D. Ill. Nov. 20, 2018) ....................6

*United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235 (3d Cir. 2004)....................3, 8

*United States ex rel. Tyson v. Amerigroup Illinois*, 488 F. Supp. 2d 719 (N.D. Ill. 2007).............7

*United States v. Bestfoods*, 524 U.S. 51 (1998) ....................4, 7, 10

*United States v. Executive Health Resources, Inc.*, 196 F. Supp. 3d 477 (E.D. Pa. 2016)..........3, 4

*United States v. President & Fellows of Harvard College*, 323 F. Supp. 2d 151 (D. Mass. 2004) ....................................................................................................................4

CVS Health Corporation submits this filing for the Court's consideration as the Court continues to weigh CVS Health Corporation's motion for a directed verdict. Before Omnicare and CVS Health Corporation's case began, there was no evidence to support a claim against CVS Health Corporation. The evidence that has come in during Defendants' case is overwhelming and one-sided: it proves CVS Health Corporation had no direct involvement in the submission of the claims at issue in this case. There is no basis for a reasonable jury to hold CVS Health Corporation liable. The Court should grant CVS Health Corporation's motion for a directed verdict.

To establish liability against Omnicare's ultimate parent, CVS Health Corporation, the government must prove CVS Health Corporation ***itself*** was directly involved in the submission of false claims. The undisputed testimony of CVS Health Corporation's Assistant Corporate Secretary disposes of any such theory. His testimony establishes: (1) CVS Health Corporation is a holding company with no employees and no day-to-day operations; (2) its officers all were employees of CVS Health Corporation subsidiaries and acted for those subsidiaries when they conducted their day-to-day activities; and (3) CVS Health Corporation's officers acted for CVS Health Corporation only when they reported to its Board or conducted its other activities, like issuing stock. This evidence proves CVS Health Corporation *did not* directly participate in the submission of any Omnicare claims, much less the claims at issue here.

The government resists that conclusion in two ways, but neither is viable. *First*, the government argues it can establish direct involvement by proving CVS Health Corporation knew about the rollover and cycle fill programs, and failed to stop those programs from continuing. A long and consistent line of authority rejects that argument. And for good reason: it is irreconcilable with Supreme Court precedent recognizing that parent companies are not liable merely because they participate in ordinary activities incident to the ownership of shares. Even the

government's own authorities support CVS Health Corporation's position. In them, the parent corporations ran their subsidiaries' businesses day-to-day and thus had direct involvement in the challenged conduct. That is a far cry from the facts here, which show at most indirect oversight of the operations of CVS Health Corporation's subsidiaries.

The government's second argument is similarly flawed. The government insists CVS Health Corporation directly participated in Omnicare's submission of rollover and cycle fill claims because it entered a Corporate Integrity Agreement related to a different investigation of Omnicare, certified compliance with that Agreement, and more generally took over Omnicare's compliance function. Again, the record refutes the government's claim. The testimony has shown that the only provision of the Corporate Integrity Agreement the government has identified as relevant to this case is, in fact, completely irrelevant. Neither that agreement nor certifications of compliance with it could possibly constitute direct involvement in the submission of the claims at issue here. And the government's assertion that CVS Health Corporation took over Omnicare's compliance function is demonstrably wrong. CVS Pharmacy, Inc.—a subsidiary of CVS Health Corporation—runs an enterprise-wide compliance program alongside Omnicare's own compliance department. But CVS Pharmacy, Inc. is not CVS Health Corporation. And CVS Pharmacy Inc.'s monitoring of Omnicare's compliance function is at the very most indirect, not direct, participation.

There is, in other words, both a total lack of evidence supporting the government's theory and affirmative evidence refuting it. This is not a close case. The Court should grant CVS Health Corporation's directed-verdict motion.

## ARGUMENT

### I. The Law: The Government Must Establish Direct Involvement—Not Just Knowledge And Inaction—To Prevail Against CVS Health Corporation.

A. To establish that CVS Health Corporation is liable under the False Claims Act, the government must prove CVS Health Corporation, itself, was "directly involved in the commission of the[] violations, which in this case would be the actual filing of claims that turn[] out to be false." (Tr. 1760:7–11; *see also* ECF 671 at 6 ("The question before the Court is whether there is any genuine issue of fact as to whether CVS Health *participated* in Omnicare's alleged filing of false claims after CVS Pharmacy's acquisition of Omnicare in 2015.").)

"[M]ere participation in a scheme that results in an eventual submission of a false claim" is not enough under that standard. *United States ex rel. Schaengold v. Memorial Health, Inc.*, 2014 WL 6908856, at *14 (S.D. Ga. Dec. 8, 2014); *see also United States v. Exec. Health Res., Inc.*, 196 F. Supp. 3d 477, 513 (E.D. Pa. 2016). Instead, the government must show that CVS Health Corporation "actually submitted a [false claim], or was directly involved in causing such a submission." *Schaengold*, 2014 WL 6908856, at *14.

Critically, courts consistently hold that "knowledge and inaction—standing alone—cannot form the basis of FCA liability" because they do not constitute direct involvement. *United States ex rel. Nedza v. Am. Imaging Mgmt., Inc.*, 2020 WL 1469448, at *11 (N.D. Ill. Mar. 26, 2020); *see also United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 245 (3d Cir. 2004); *Exec. Health Res.*, 196 F. Supp. 3d at 513; *United States ex rel. Dunlap v. Alaska Radiology Assocs.*, 2017 WL 6048167, at *7 (D. Alaska Mar. 31, 2017); *United States ex rel. Polukoff v. St. Mark's Hospital*, 2016 WL 1449219 (M.D. Tenn. Apr. 13, 2016); *Bastidas v. Good Samaritan Hosp.*, 2014 WL 1022563, at *7 (N.D. Cal. Mar. 13, 2014); *United States ex rel. Bartlett v. Tyrone Hosp., Inc.*, 234 F.R.D. 113, 125 (W.D. Pa. 2006). Courts thus routinely reject False

Claims Act theories against parent corporations where the parents knew about the "alleged fraudulent scheme" but did nothing to stop it. *Exec. Health Res.*, 196 F. Supp. 3d at 513; *see also Bartlett*, 234 F.R.D. at 125 ("Quorum and Triad did not contract with the Government for reimbursement of the claims at issue and, assuming as true that they knew of this illegal scheme being conducted within the corporate entity they managed, this knowledge does not equate to causing the false claims and submission of false records."). Instead, the parent corporation must take active steps—like approving cost reports containing false claims or participating in overbilling the government. *See, e.g.*, *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 62 (D.D.C. 2007); *United States v. President & Fellows of Harvard College*, 323 F. Supp. 2d 151, 187–88 (D. Mass. 2004).

That requirement makes good sense: "It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation ... is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998). "[R]egular oversight" of a subsidiary will not make a parent liable, *Nedza*, 2020 WL 1469448, at *5; nor is it enough for the subsidiary to be integrated into the parent's corporate structure, or for the parent and subsidiary to have overlapping managers, directors, and officers. *Exec. Health Res.*, 196 F. Supp. 3d at 512–13. Otherwise, a parent corporation could be liable merely for keeping tabs on its subsidiary's activities, contrary to "hornbook law." *Bestfoods*, 524 U.S. at 61.

B. The summary-judgment decision in *United States ex rel. Martino-Fleming v. South Bay Mental Health Centers*, 540 F. Supp. 3d 103, 130 (D. Mass 2021), does not undermine these settled rules. In *Martino-Fleming*, the district court held that a parent corporation's "knowing ratification of the prior policy of submitting false claims by rejecting recommendations to bring South Bay into regulatory compliance constitut[ed] sufficient participation in the claims process to trigger False Claims Act liability." *Id.* (cleaned up).

On *Martino-Fleming*'s facts, that ruling was consistent with the settled and extensive authorities holding that knowledge and inaction do not constitute direct involvement. As the *Martino-Fleming* court emphasized in its motion-to-dismiss ruling, the parent corporation's principals and managing director were "heavily involved in the operational decisions of [the subsidiary], including approving contracts, strategic planning, budgeting, and earnings issues." *United States ex rel. Martino-Fleming v. S. Bay Mental Health Ctr., Inc.*, 2018 WL 4539684, at *2 (D. Mass. Sept. 21, 2018); *see also id.* at *5 ("Because it is alleged that H.I.G. members and principals formed a majority of the C.I.S. and South Bay Boards, and were directly involved in the operations of South Bay, the motion to dismiss the H.I.G. entities is also denied.").

The Commonwealth of Massachusetts expanded on that discussion in its summary-judgment briefing. The government stressed that the parent corporation "was heavily involved in [the subsidiary's] operations," knew about the supposedly unlawful practice, and "repeatedly rejected recommendations that would have corrected it." (Summ.-Judg. Br., *United States ex rel. Martino-Fleming v. S. Bay Mental Health Ctr., Inc.*, 15-cv-13065 (D.Mass. Jun. 19, 2020) [ECF 306], at 1.) The government noted that the parent corporation "entered into a management services agreement ... wherein it agreed to provide management, consulting, and financial advisory services" to the subsidiary. *Id.* at 11. And, critically, the government explained that the parent's "approval would have been required" to change the challenged practices. *Id.* at 8.

The parent company in *Martino-Fleming*, in other words, had a direct and substantial role in running the business day-to-day. The subsidiary could not change the challenged practice without the parent's approval. And the parent would not let the subsidiary make a change. In that scenario, it is no surprise the court found the parent's participation sufficient to create liability. The parent—unlike CVS Health Corporation—*was* directly involved in the challenged process through its day-to-day management of the subsidiary. And its affirmative rejection of

proposals that could not go into effect without its approval was a specific act that caused the subsidiary to continue submitting false claims. That the district court's two-paragraph discussion of parent liability on summary judgment (in an opinion that took up thirty-two pages) did not include all of these facts is of little moment. It is the same case, before the same court, with the same suite of facts; and in all events, the summary-judgment decision *cited* the portion of the court's dismissal opinion noting parental control. *See Martino-Fleming*, 540 F. Supp. 3d at 130 (citing *Martino-Fleming*, 2018 WL 4539684, at *5). The facts about the parent's role in running its subsidiary's day-to-day operations square *Martino-Fleming* with the long, consistent, and correct line of authority holding that mere knowledge and inaction by a parent does not establish direct involvement for purposes of a False Claims Act claim.

For similar reasons, the other cases the government featured in its opposition to CVS Health Corporation's initial directed-verdict motion do not support its position. Start with *United States ex rel. Schagrin v. LDR Industries*, 2018 WL 6064699 (N.D. Ill. Nov. 20, 2018). The district court there asked whether the parent "took an active role in the scheme." *Id.* at *5 (cleaned up). In *Schagrin*, as in *Martino-Fleming*, the parent company both "owned ***and managed***" the subsidiary's operations. *Id.* at *6 (emphasis added). Given "the degree to which that party was involved in the scheme that results in the actual submission," it was possible that the parent corporation could be liable for the subsidiary's submission of allegedly false claims—although the Court did not so hold because the plaintiff did not plead its claim sufficiently. *Id.* As in *Martino-Fleming*, the parent corporation could be liable ***not*** because it knew of an issue and failed to act, but because it actually was running the business day-to-day.

*United States ex rel. Long v. SCS Business and Technical Institute*, 999 F. Supp. 78 (D.D.C. 1998), has nothing to do with parent-corporation liability; rather, it relates to when a *State* can be sued under the False Claims Act. And *Long* is a decision, the government omits, the

D.C. Circuit reversed. *United States ex rel. Long v. SCS Business and Tech. Inst.*, 173 F.3d 870 (D.C. Cir. 1999). In *Long*, the relator alleged New York conspired with the defendant, actively hamstrung the relator's investigation, concealed information the relator discovered, and reached a "sweetheart" deal with the defendant to allow the continued submission of false claims to the federal government. 999 F. Supp. at 81–82. Given all of that, the court determined the relator adequately alleged New York had caused the submission of a false claim. *Id.* at 91. The court did not address the parent-subsidiary context or the direct-participation standard; the State was an alleged co-conspirator. (The government here did not assert a False Claims Act conspiracy theory.)

Finally, *United States ex rel. Tyson v. Amerigroup Illinois*, 488 F. Supp. 2d 719 (N.D. Ill. 2007) and *United States ex rel. Hockett v. Columbia/HCA Healthcare*, 498 F. Supp. 2d 25 (D.D.C. 2007), only illustrate the direct-participation requirement in action. In *Tyson*, the parent set parts of the challenged policy itself, gave direction on the challenged program to the subsidiary's personnel, and provided marketing services to the subsidiary. 488 F. Supp. 2d at 737. In light of those facts, the court found that the parent had "actively participated in [its subsidiary's] fraudulent conduct causing the false claims to be submitted." *Id.* at 737. And in *Hockett*, the court denied summary judgment to a parent company because there was evidence that the "parent ... was directly involved in the process of finalizing a cost report and billing the government." 498 F. Supp. 2d at 62.

The government reads its cases to mean that a parent's knowledge the subsidiary is submitting false claims, along with inaction, establishes direct involvement. If that were correct, these cases would be outliers and would conflict with "general principle[s] of corporate law deeply ingrained in our economic and legal systems." *Bestfoods*, 524 U.S. at 61 (cleaned up). But they are not and do not. In each case, there was direct involvement in the submission of

false claims—either because a party took direct steps to support the submission of false claims, or because it was intimately involved in the day-to-day operations of its subsidiary. The core principles articulated in cases like *Zimmer*, *Schaengold*, *Executive Health Resources*, *Nedza*, *Dunlap*, *Bartlett*, *Polukoff*, and *Bastidas* control. To prevail, the government must show more than knowledge and inaction. It must show direct involvement in the submission of false claims.

## II. The Evidence: The Government Has Not Established And Cannot Establish CVS Health Corporation's Direct Participation.

In its initial directed-verdict motion, CVS Health Corporation established there is no evidence CVS Health Corporation was directly involved in Omnicare's alleged fraud. Now, after the witnesses relevant to CVS Health Corporation's alleged liability have testified, the record affirmatively forecloses a finding of direct involvement. The isolated snippets from documents the government referenced during the directed-verdict argument do not alter this conclusion.

### A. The Record Refutes Any Finding of Direct Participation.

CVS Health Corporation called Thomas Moffatt, a CVS Pharmacy, Inc. employee and CVS Health Corporation's Assistant Corporate Secretary. Moffatt is the only CVS Health Corporation officer either side called. And his testimony eliminates any doubt about CVS Health Corporation's lack of role in Omnicare's operations—including in the submission of claims the government challenges in this case. Moffatt testified:

- CVS Health Corporation is a holding company with no employees of its own. (Tr. 2582:5–15.) All of CVS Health Corporation's officers are employed by subsidiaries. (Tr. 2581:6–14, 2582:5–15.)

- CVS Health Corporation's officers act in their CVS Health Corporation capacity "[s]olely in connection with the SEC filings, New York Stock Exchange filings, … and in connection with the Board of Directors of CVS Health Corporation." (Tr. 2582:16–2583:6.) All other activities CVS Health Corporation officers undertake day-to-day are on behalf of the subsidiary corporate entities that employ them. (Tr. 2583:18–2584:2.)

- Rocky Kraft (an Omnicare employee) and David Falkowski (a CVS Pharmacy, Inc.

employee) held officer titles with CVS Health Corporation. But neither Kraft nor Falkowski acted on behalf of CVS Health Corporation when they conducted their day-to-day business. They only acted in their CVS Health Corporation capacities when they reported to the CVS Health Corporation Board. (Tr. 2584:4–2586:5.)

- CVS Health Corporation has no role in its subsidiaries' operations. (Tr. 2581:15–2582:4, 2586:6–11, 2586:19–2587:22.) It does not operate long-term-care or retail pharmacies (Tr. 2582:1–4); has no role in dispensing medicine, for Omnicare or any other subsidiary (Tr. 2586:19–21, 2587:11–13); and has no role in submitting claims to Medicare, Medicaid, or TRICARE, for Omnicare or any other subsidiary (Tr. 2586:22–2587:3, 2587:14–16). Moreover, CVS Health Corporation does not run the compliance function for its subsidiaries, including Omnicare. (Tr. 2587:17–22.)

- The "CVS Health" logo that is on emails and other documents is a trademark owned by CVS Pharmacy, Inc. (Tr. 2588:7–16.) The presence of that logo does not mean that the email or document comes from CVS Health Corporation. (Tr. 2588:4–6.)

- Any operational activities conducted under the 2016 Corporate Integrity Agreement were conducted by CVS Health Corporation's subsidiaries. (Tr. 2589:9–2590:3.)

- The two individuals who held the role of Compliance Officer for IPS Operations under the Corporate Integrity Agreement were employees of Caremark, LLC. Neither was an officer of CVS Health Corporation or had any role of any kind with CVS Health Corporation at any time. (Tr. 2590:6–2591:14.)

Moffatt's uncontroverted testimony is dispositive. No reasonable jury could conclude that any officer of CVS Health Corporation, in their CVS Health Corporation capacity, participated at all—much less directly—in the submission of the claims at issue here.

The government's cross-examination of Moffatt only proves the point. The government, for example, spent time on the page titled "Corporate Structure" from a 500-page Corporate Integrity Agreement Implementation Report. (GX-0427 at -288.) The government emphasized the first two paragraphs of that page, which described CVS Health Corporation as "an integrated pharmacy services company" with "two operating business segments," and explained briefly what those operating business segments do. (GX-0427 at -288; *see* Tr. 2597:13–2600:12.) But the government left out the very next paragraph: "Attached are three corporate entity organizational charts." (GX-0427 at -288). The government never displayed those charts, to Moffatt or

anyone else. For good reason. The ten pages of organizational charts immediately following the government's cherry-picked paragraphs confirm Moffatt's testimony and show that CVS Health Corporation is a holding company with many direct and indirect subsidiaries that conduct the activities of the business. (GX-0427 at -290–300.)

The government also emphasized on Moffatt's cross-examination that Falkowski, as the Chief Compliance Officer of "CVS Health," had certain specific responsibilities under the Corporate Integrity Agreement, including the responsibility to "develop[], implement[], and enforc[e] policies procedures and practices designed to ensure compliance with ... Federal health care program requirements." (GX-1503 at 4–5; Tr. 2601:23–2605:1.) But, as Moffatt explained, "CVS Health" in the Agreement refers to "CVS Health Corporation ***and its subsidiaries*** (collectively, 'CVS Health')." (GX-1503 at 1 (emphasis added); Tr. 2589:9–2590:3.) Falkowski was the Chief Compliance Officer of CVS Pharmacy, Inc. and, in that capacity, had responsibility for implementing compliance programs across the enterprise. (Tr. 2612:19–23, 2621:5–16.) He, as detailed, acted in his capacity as CVS Health Corporation's Chief Compliance Officer only when he reported to the CVS Health Corporation Board. (Tr. 2585:10–2586:5). And in all events, there is no evidence Falkowski participated directly in developing, implementing, or enforcing *any* compliance policies relevant to this case. (In fact, as Omnicare showed in its initial directed-verdict motion, the evidence shows only that Falkowski may have had knowledge of alleged issues with Omnicare's dispensing—nothing more. (ECF 735 at 6–7.))

Moffatt's evidence, in short, puts what CVS Health Corporation established in its initial directed-verdict motion beyond doubt. CVS Health Corporation had nothing remotely close to direct involvement in the events at issue in this case. The most the government's evidence could show is oversight by a parent corporation. But ordinary corporate oversight does not establish liability. *See Bestfoods*, 524 U.S. at 61; *Nedza*, 2020 WL 1469448, at *5.

### B. The Government's Directed-Verdict Documents Do Not Establish Direct Participation.

During the directed-verdict argument, the government characterized its theory of liability against CVS Health Corporation as the following:

> [CVS Health Corporation] made a promise under the CIA [and] it certified compliance with the CIA repeatedly. And at that time, it also took over the compliance functionality at Omnicare, told Omnicare what it was doing wrong, made recommendations for how to make it right, tracked that repeatedly through the relevant time period, and for that entire time did not actually require that Omnicare follow its recommendations.

(Tr. 2158:7–17.) That argument falters at every step.

Start with the government's contention that CVS Health Corporation "made a promise" under the Corporate Integrity Agreement. The government concedes the genesis of the Agreement has nothing to do with this case. (Tr. 2142:3–14.) But it nevertheless insists Section III(E)(2) is a relevant "promise." (The Court otherwise explained that Section III(E) does not have any relevant language. (Tr. 2144:21–2146:6.)) The government is wrong.

Section III(E)(2) provides that "CVS Health" (which is not the same as CVS Health Corporation) will establish and implement "a schedule of routine audits of the Automated Label Verification system and any other automated prescription labeling and dispensing system used in IPS Operations to ensure accurate prescription drug labeling, tracking, dispensing, and billing to the Federal health care programs." (GX-1503 at 18.) The Automated Label Verification system, as Omnicare pharmacist Jaclyn Alexander explained, is a "packaging machine[]"—essentially, a robot. (Tr. 2766:23–2767:5; *see also* Tr. 2765:10–2766:22.) Neither it, nor any of Omnicare's other automated labeling and dispensing systems, has anything to do with rollover or cycle fill, which occur as part of a separate system before labels are printed or drugs are dispensed. (Tr. 2766:23–2767:10.) Thus, even though the second clause refers to "any other automated prescription labeling and dispensing system used in IPS Operations," that is just different from the

computer functions the government has put at issue here. (And it is why even the risk tracker the government is so fond of (GX-229) refers only to an "indirect" connection between those functions and the Corporate Integrity Agreement.) Section III(E)(2) is irrelevant.

In all events, all that Section III(E)(2) requires is "establishing and implementing a schedule of routine audits." (GX-1503 at 18). There is no indication that such audits did not take place, or that any entity in the CVS family of companies failed to establish such audits. And on the merits, a failure to audit could not establish causation even in the loosest sense. Nothing in the Corporate Integrity Agreement—and therefore nothing in the subsequent certifications attesting to compliance with the Corporate Integrity Agreement—remotely suggests that CVS Health Corporation is liable because it was directly involved in the submission of claims in this case.

That leaves the government's contention that CVS Health Corporation—a holding company with no employees—"took over the compliance functionality at Omnicare," made suggestions for changes, and did not require that those changes be implemented. (Tr. 2158:7–17.) But CVS Health Corporation did not take over Omnicare's compliance function, as Moffatt confirmed. Instead, CVS Pharmacy—a subsidiary of CVS Health Corporation—oversaw the enterprise's compliance function. That alone is reason enough to reject the balance of the government's theory.

But even if the government were correct and—contrary to reality—CVS Health Corporation oversaw the enterprise's compliance function, there still would not be evidence of direct involvement in the submission of claims in this case (or that CVS Health Corporation caused the submission of false claims). The lynchpin of the government's theory is David Falkowski—someone the government *never deposed* (but whose name has appeared in the trial record more than 120 times). The evidence as to Falkowski is limited to the fact he was aware of potential dispensing issues at Omnicare. (ECF 735 at 6–7.) Beyond that, the most the government could

point to at the directed-verdict hearing were risk trackers (*e.g.*, GX-229), and email chains reflecting compliance personnel monitoring or reporting on the progress of various issues (*e.g.*, GX-147, GX-416). As CVS Health Corporation detailed at the hearing (*e.g.*, Tr. 2178:23–2179:25)—and in the interests of avoiding repetitiveness it does not repeat in detail here—those exhibits, at best for the government, establish that CVS personnel—who, in reality, are employees of CVS Pharmacy—were monitoring the progress of issues related to rollover and cycle fill (Tr. 2178:4–14; *see generally* ECF 735 at 9–12). That, as the Court recognized, does not establish "[p]articipation in the claims filing process." (Tr. 2181:15–17.)

**CONCLUSION**

The government has not put forward a scrap of evidence that the holding company, CVS Health Corporation, was directly involved in submitting a single claim. Nor has it put forward any evidence that CVS Health Corporation took any affirmative steps to cause Omnicare to submit false claims. In the end, the government's arguments against CVS Health Corporation all boil down to the same thing: CVS Health Corporation knew that Omnicare might be, or even was, submitting false claims and did not stop the claims from being submitted. But the actual CVS entity that had such knowledge, if any, was not CVS Health Corporation; it was CVS Pharmacy. And, in all events, under a long, settled, and—reading the government's cases in context—completely consistent line of cases, knowledge and inaction are not enough to make a parent corporation liable for the activities of its subsidiary.

For the foregoing reasons, as well as for the reasons CVS Health Corporation detailed in its initial directed-verdict motion (ECF 735) as well as at the April 14, 2025 directed-verdict hearing, the Court should grant judgment to CVS Health Corporation as a matter of law.

Dated: April 21, 2025

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

/s/ Enu Mainigi
Enu Mainigi (*pro hac vice*)
Holly Conley (*pro hac vice*)
William Ashworth (*pro hac vice*)
Beth A. Stewart (*pro hac vice*)
David Randall J. Riskin (*pro hac vice*)
Benjamin Hazelwood (Bar No. 5001508)
Suzanne Salgado (*pro hac vice*)
680 Maine Avenue, S.W.
Washington, DC 20024
(202) 434-5000

For matters in New York:
650 Fifth Avenue
Suite 1500
New York, NY 10019

*Attorneys for CVS Health Corporation*