**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 4/24/2025

——————————————————————————x

UNITED STATES OF AMERICA, et al., *ex rel.*
URI BASSAN,

        Plaintiffs,

  -against-

OMNICARE, Inc.,

        Defendant.

——————————————————————————x

UNITED STATES OF AMERICA,

        Plaintiff,

  -against-

OMNICARE, INC. and CVS HEALTH CORP.,

        Defendants.

——————————————————————————x

15 Civ. 4179 (CM)

**DECISION AND ORDER RESERVING JUDGMENT ON DEFENDANT CVS HEALTH
CORPORATION'S MOTION FOR DIRECTED VERDICT**

McMahon, J.:

      This motion arises in the *qui tam* False Claims Act ("FCA") action originally brought in

June 2015 by relator Uri Bassan on behalf of the federal government, 29 states, and the District of

Columbia against Defendant Omnicare, Inc., a long-term pharmacy. In 2019, the United States

(the "Government") intervened in the action, filing a complaint against Defendants Omnicare and

CVS Health Corporation,[1] whose wholly owned subsidiary, CVS Pharmacy, Inc. ("CVS Pharmacy"), had completed its purchase of Omnicare in August 2015.

The Government alleges that, between 2010 and 2018, Omnicare consistently dispensed prescription drugs to individuals living at long-term residential facilities that were not supported by valid prescriptions under state law, as required by federal regulations. Omnicare nonetheless submitted claims for reimbursement to several federal healthcare programs. These submissions for reimbursement are alleged to have contained false information in violation of the FCA. The Government alleges that Omnicare collected $460,034,505 in illegal reimbursements, for which it is liable. It further alleges that Omnicare's ultimate parent, CVS Health Corp., "caused" Omnicare to file false and fraudulent claims – largely by failing to correct known deficiencies in Omnicare's dispensing practices.

Trial by jury commenced on April 1, 2025, and the Government rested its case on April 11, 2025. CVS Health Corp. immediately moved for a directed verdict pursuant to Fed. R. Civ. P. 50(a), on the ground that it had no involvement in Omnicare's dispensation of drugs, and that the Government had sued the wrong CVS entity. The Government opposed CVS Health Corp.'s motion. The Court reserved judgment on the motion. This opinion explains why.

## BACKGROUND

CVS Pharmacy is a wholly owned subsidiary of defendant CVS Health Corp., and CVS Pharmacy acquired Omnicare on or about August 18, 2015. Dkt. No. 587-1, ¶ 7. Prior to August

---

[1] The evidence demonstrates that the numerous corporations under the CVS umbrella used the trademark "CVS Health" to identify themselves as being part of that network and to identify the services provided. Additionally, the term "CVS Health" in the Corporate Integrity Agreement that is integral to this decision is a defined term and that definition encompasses CVS Health Corporation and ALL of its subsidiaries – not just the parent holding company. I thus refuse to call the ultimate parent "CVS Health." It must at all times be referred to as CVS Health Corp. The parties are admonished to use that nomenclature and none other when referring to the corporation that is the defendant in this case. Carelessness in this regard is impermissible.

2

2015, Omnicare had no relation to CVS Health Corp., CVS Pharmacy, or any other entity in the CVS family of companies. *Id.* ¶ 6.

In 2020, CVS Health Corp. moved to dismiss all counts asserted against it by the Government, arguing that the Government failed to allege that CVS Health Corp. directly participated in the allegedly unlawful scheme perpetrated by Omnicare. That Rule 12(b)(6) motion was denied. *United States v. Omnicare, Inc.*, No. 1:15-CV- 4179 (CM), 2021 WL 1063784, at *13 (S.D.N.Y. Mar. 19, 2021). The Court concluded that the Government had sufficiently alleged at the pleading stage that CVS Health Corp. directly participated in the scheme by allegedly "assum[ing] an active role in overseeing Omnicare's operations, including pharmacy dispensing practices and systems" after the acquisition of Omnicare in 2015. *Id.* at *13 (citing Dkt. No. 17, ¶ 21). That opinion expressed no opinion about the validity of those allegations – nor could it have, since it was simply a motion addressed to the pleading. The evidence that might support these allegations remained to be developed.

A few weeks before trial, CVS Health Corp. moved *in limine*[2] for summary judgment, arguing that "the evidence shows that Omnicare continued to manage its own dispensing and claim-submission functions even after being acquired by a CVS Health subsidiary." Dkt. No. 587, at 1. Again, I denied the motion, "but barely." Dkt. No. 671 at 9. The principal ground for the motion was that CVS Health Corp. was "a holding company that has no pharmacy operations and is primarily tasked with issuing stock and filing SEC reports." Dkt. No. 587, at 4. The evidence cited by the Government was principally if not exclusively evidence about CVS Health Corp.'s *awareness* of Omnicare's conduct relating to cycle fill/rollover dispensing and the use of chart

---

[2] The Court had previously reminded the parties that motions *in limine* were supposed to be addressed to evidentiary issues and that summary judgment motions in the guise of motions *in limine* were not appropriate. Nonetheless, CVS Health Corp. filed a motion for summary judgment along with its motions *in limine*. The Court decided to consider it, even though it was not appropriately filed in that context.

orders as substitutes for actual (what pharmacists call "retail") prescriptions – the conduct that the Government alleges to be illegal. I held then, and I hold again today, that awareness is not enough to constitute the "direct participation" or "causation" that would be required to hold CVS Health Corp. liable for any illegal dispensings by Omnicare. *See, e.g., United States ex rel. Nedza v. Am. Imaging Mgmt., Inc.*, 2020 WL 1469448 (N.D. Ill. Mar. 26, 2020); *United States ex rel. Dunlap v. Alaska Radiology Assocs.*, 2017 WL 6048167 (D. Alaska Mar. 31, 2017) ("*Dunlap II*"); *United States ex rel. Bartlett v. Tyrone Hosp., Inc.*, 234 F.R.D. 113 (W.D. Pa. 2006). However, I declined to grant the motion for summary judgment so that the Government could present evidence at trial about obligations allegedly undertaken by CVS Health Corp. in its October 11, 2016 Corporate Integrity Agreement ("CIA") with the U.S. Department of Health and Human Services, Office of the Inspector General ("HHS-OIG"). *See* GX-1503. The Government argued that various breaches of this agreement by CVS Health Corp. caused Omnicare to persist in its illegal behavior.

Now that the Government has rested its case, CVS Health Corp. argues that the Government has not satisfied its burden to show that CVS Health Corp. did or failed to do anything that "caused" Omnicare to file false or fraudulent claims – both because it is a holding company with no employees or business other than owning its subsidiaries, and because the Government's allegations amount to nothing more than conduct (or lack of conduct) that has been held insufficient to make out a False Claims Act violation on the part of a non-submitting party in various other cases. For those reasons, it moves for a directed verdict.

## LEGAL STANDARD

The Court may grant judgment as a matter of law under Fed. R. Civ. P. 50 "only when 'a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Cash v.*

*Cnty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (quoting Fed. R. Civ. P. 50(a)(1)).[3] Such a motion "may be granted only if the court, viewing the evidence in the light most favorable to the non-movant, concludes that a reasonable juror would have been *compelled* to accept the view of the moving party." *Cash*, 654 F.3d at 333 (internal quotation omitted) (emphasis in original).

## DISCUSSION

The Government argues that "the jury may reasonably conclude that CVS Health directly participated in causing Omnicare's submission of false claims by assuming control of Omnicare's compliance function, identifying specific risks posed by the illegal dispensing at issue in this case, and failing to take the straightforward steps CVS Health itself identified to address the compliance failures." Dk. No. 735, at 2. Accordingly, the Government argues that "the jury should be permitted to render a final verdict on whether CVS Health caused Omnicare to submit false claims to the Government." *Id.* The Government's repeated references to "CVS Health" are unhelpful, since that term is broader than "CVS Health Corporation," the defendant in this case. I will for purposes of this opinion only (and without prejudice to any argument or findings on post-trial motion) assume that these arguments are being made with respect to CVS Health Corporation, the defendant.

### I.    There is Sufficient Evidence to Enable a Reasonable Jury to Find that CVS Health Corporation Caused Omnicare to File False Claims

#### a.    Summary of the Evidence

The Government's theory of liability, viewing the evidence most favorably to the Government, is as follows:

CVS Health Corp. assumed the responsibility to oversee and control Omnicare's compliance function 14 months after its wholly owned subsidiary, CVS Pharmacy, acquired

---

[3] The standard for judgment as a matter of law at the close of evidence is the same as the standard for summary judgment. *See Piesco v. Koch,* 12 F.3d 332, 341 (2d Cir. 1993).

Omnicare in August 2015. It did so by signing the CIA on or about October 11, 2016. The purpose

of the CIA was, *inter alia*, "to promote compliance with the statutes, regulations, and written

directives of Medicare, Medicaid, and all other Federal health care programs." GX-1503 at 1. The

Government concedes that this agreement was principally occasioned by an entirely different *qui*

*tam* case that had been brought against Omnicare years earlier, alleging pre-acquisition violations

of various anti-kickback statutes – indeed, the text of the CIA is overwhelmingly directed to

oversight designed to avoid violations of that sort. However, the Government argues that Section

III.E of the CIA obligated CVS Health Corp. and its subsidiaries, collectively defined as "CVS

Health," to "create systems and procedures reasonably designed to ensure the accurate . . .

dispensing[] and billing of the drug name and manufacturer to the Federal health care programs of

prescription drugs dispensed or used in connection with the IPS Operations." *Id.* at 17-18. The

Government argues that this imposed on CVS Health Corp. an obligation to create systems to

ensure that Omnicare's dispensings complied with federal healthcare program requirements. GX-

229; Tr. 1770-73 (referencing CIA-related dispensing risks).[4]

The Government asserts that CVS Health Corp. promptly undertook to carry out these

obligations. It contends that the ultimate parent had already absorbed Omnicare's compliance

function into its overall corporate compliance function via a fairly standard parent/subsidiary

Shared Services Agreement. Pursuant to that Shared Services Agreement, the CVS Health empire

(CVS Health Corp. and its subsidiaries) already had a Chief Compliance Officer for the entire

corporate enterprise – an individual named David Falkowski, who (as is often the case) wore

multiple corporate hats, one of which was that he was the Chief Compliance Officer for CVS

---

[4] Defendants argue that the language of Section III.E, read in context, limited its scope to machinery like the "automated label verification system" that was the principal focus of that section. Tr. 2146. That issue will no doubt be argued to the jury, and will be addressed by this Court as necessary in any post-trial arguments.

Health Corp.[5] The CIA acknowledged that CVS Health (the overall enterprise, holding company plus all of its subsidiaries) had a Chief Compliance Officer, and required that a Compliance Officer for IPS Operations be appointed. This individual – who the undisputed evidence indicates was an employee of Caremark LLC – reported upstream to Mr. Falkowski, the overall enterprise Chief Compliance Officer for the entire enterprise. Tr. 2590-91. The CIA contains a provision that makes

> The Chief Compliance Officer and the Compliance Officer for IPS Operations . . . responsible for, without limitation . . . overseeing all compliance matters related to CVS Health's IPS Operations; . . . developing, implementing, and enforcing policies, procedures, and practices designed to ensure compliance with the requirements set forth in this CIA and with Federal health care program requirements; . . . making periodic (at least quarterly) reports regarding compliance matters relating to the IPS Operations directly to the Board Committee (defined below) of the Board of Directors of CVS Health, and shall be authorized to report on such matters to the Board Committee at any time. Written documentation of the Chief Compliance Officer and Compliance Officer for IPS Operations' reports to the Board Committee shall be made available to OIG upon request; . . . monitoring the day-to-day compliance activities engaged in by CVS Health related to the IPS Operations as well as for any reporting obligations created under this CIA; . . . reviewing and addressing the findings made and internal audits conducted as part of the Risk Assessment and Internal Review Process required by Section III.G; and . . . reviewing and addressing the Financial Tracking Report of Arrangements created as part of the Risk Assessment and Internal Review Process required by Section III.G.

GX-1503 at 4-5.

Defendants insist that the actual authority to come up with solutions to compliance problems at any particular operating company rested with the operating company – meaning that Omnicare was responsible for devising and implementing solutions to any compliance problems involving IPS Operations, because Omnicare was the operating company in the IPS Operations field. Moreover, the text of the CIA made it clear that it was binding specifically and particularly on Omnicare, not any other CVS Health Corp. subsidiary.[6] But the Government argues that this

---

[5] The undisputed evidence indicates that Mr. Falkowski was employed by CVS Pharmacy – which is to say, he was on its payroll – and he was the Chief Compliance Officer for CVS Pharmacy, an entity that, unlike the holding company parent, actually had pharmacological compliance issues.

[6] "Except as otherwise specified herein, the terms of this CIA shall apply to Omnicare, Inc. and its operating subsidiaries, which is CVS Health's business line of institutional pharmacy services operations." GX-1503 at 1.

term of the CIA made Mr. Falkowski personally responsible for ensuring that Omnicare (and any other CVS-related corporation) complied with federal law regarding the submission of claims for reimbursement. And the Government insists that, whoever paid his salary, Mr. Falkowski was wearing his CVS Health Corp. officer hat, not his CVS Pharmacy hat, when he exercised (or failed to exercise) that function – meaning that CVS Health Corp. was responsible for making sure that its subsidiary was in compliance with the False Claims Act. Tr. 1597-1611.[7]

      The Government next asserts that members of the CVS Health enterprise Risk Assessment team – including Jason Archer – identified (i) cycle fill/rollover dispensing to assisted living and other non-skilled facilities and (ii) the acceptance of chart orders as potential compliance issues shortly after CVS Pharmacy acquired Omnicare. GX-413. A risk tracker internal to CVS Pharmacy and circulated on January 10, 2017 – three months after the CIA was signed – reflected the dispensing and charter order issues as high-priority risks requiring resolution by January 30, 2017. GX-228; Tr. 1756-59. The same potential problems were also identified in a CIA-specific risk tracker circulated two months later, on March 28, 2017. GX-229; Tr. 1770-73. The risk trackers identified steps that should be taken to address these issues – for cycle fill/rollover, an update to system programming to ensure prescriptions do not automatically rollover without authorization by pharmacy personnel according to state/federal regulation; for chart orders, a state-by-state review of relevant laws to ensure that pharmacies in each state were in compliance with all local requirements – compliance with which is are mandated under Medicare, Medicaid, and TRICARE. The risk trackers identified these issues as being "indirectly" related to Section III.E of the CIA. GX-229.

---

[7] Its evidence on this point is, I fear, vanishingly thin. I look forward to hearing argument on this point during closing.

There is evidence that Mr. Falkowski, the Chief Compliance Officer for the entire CVS Health enterprise, was told about these risks and about the steps that members of the Compliance Teams deemed necessary to address them. GX-4, GX-209, GX-210; GX-235. However, despite having certified to the Government on March 1, 2017, as required by the CIA, that "CVS Health [i.e., CVS Health Corp and all of its subsidiaries] has implemented procedures reasonably designed to ensure the accurate . . . dispensing of prescription drugs related to the IPS Operations as required in Section III.E [of the CIA]," CVS Health Corp. – the defendant, the ultimate parent corporation of Omnicare – took no steps to force Omnicare to resolve these problems. GX-427 at 523. As a result, the Government contends, the compliance problems at Omnicare that had been identified at the highest corporate levels of CVS remained unresolved – indeed, in the case of cycle fill/rollover, the Government asserts that Omnicare, with the knowledge of Mr. Falkowski, took a "business decision" to undo a computer coding change that would have resolved that issue, pending further review.[8] GX-246; GX-416; Tr. 1862-63. The Government asserts that, by identifying and choosing not to resolve compliance problems while submitting certifications of compliance to the Government pursuant to the CIA, CVS Health Corp. engaged in a course of conduct that "caused" its subsidiary, Omnicare, to continue filing false and fraudulent claims for a prolonged period of time following its acquisition of that company.

Assuming a reasonable jury could conclude that the above assertions of fact are true, that does not answer the ultimate question – which is whether these facts, if proved, would support a finding that CVS Health Corp. "*knowingly assisted* in causing the government to pay claims which were grounded in fraud, without regard to whether [CVS Health Corp.] had direct contractual

---

[8] Counsel proffered that this "business decision" was necessitated because various local pharmacies around the country, acting on their own, were making inconsistent decisions about how the "Retirement" field should be coded, but as of this writing, there is no evidence in the record to that effect. There was certainly no evidence to this effect at the close of the Government's case.

relations with the government." *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 544 (1943) (emphasis added). This is, in large part, a case of first impression in this Circuit, and indeed, there is virtually no law that we have found at the circuit court level in any circuit involving identical or even particularly close facts. What follows is a summary of the law provided to the Court by the parties and found through our own research.

### b. Knowledge of False Claims, Coupled with Standard Corporate Ties, Is Insufficient to Prove Causation

What is abundantly clear from the overwhelming majority of cases cited in the parties' briefs, and from the Court's own research, is that a defendant's "mere awareness that another may, or even has, chosen to make [a false] claim does not alone constitute causing a false claim to be presented." *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 245 (3d Cir. 2004) (internal citations omitted). This is true, even if the party making a false claim is the defendant's corporate subsidiary or affiliate. "[I]t is hornbook law that the exercise of the 'control' which stock ownership gives to the stockholders . . . will not create liability beyond the assets of the subsidiary. That 'control' includes the election of directors, the making of by-laws ... and the doing of all other acts incident to the legal status of stockholders." *United States v. Bestfoods*, 524 U.S. 51, 61–62 (1998) (internal citations omitted). The False Claims Act does not change that rule of hornbook law.

These run-of-the-mill ties that bind corporate parents and subsidiaries together are insufficient, even where a defendant has "benefitted from [a subsidiary] financially, . . . [has] knowledge of [a subsidiary's] practices and . . . [has] overlapping employees, managers or officers, such connections are too far removed to establish direct involvement in a scheme subject to FCA liability." *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 196 F. Supp. 3d 477, 514 (E.D. Pa. 2016); *see also United States ex rel. Schaengold v. Mem'l Health, Inc.*, 2014 WL 6908856, at *11 (S.D. Ga. Dec. 8, 2014). Similarly, courts have found that allegations of a parent's "regular

10

oversight" over a subsidiary that "always maintained control over its internal coverage guidelines," or conclusory allegations of a parent being "intimately involved in the design and direct approval of [a subsidiary's] rigged . . . process does not, on its own, plausibly allege [the parent's] direct participation." *United States ex rel. Nedza v. Am. Imaging Mgmt., Inc.*, 2020 WL 1469448, at *5, *11 (N.D. Ill. Mar. 26, 2020) (internal citations omitted). Rather, "To 'cause' [a] false claim to be submitted, it must be the natural, ordinary and reasonable consequence of one's conduct." *United States ex rel. Kolchinsky v. Moody's Corp.*, 162 F. Supp. 3d 186, 195 (S.D.N.Y. 2016) (cleaned up).

This rule is equally true where that parent-subsidiary relationship is defined in part by the terms of a Corporate Integrity Agreement. In the case of *Bastidas v. Good Samaritan Hosp.*, 2014 WL 1022563 (N.D. Cal. Mar. 13, 2014), the Court granted a motion to dismiss claims asserted against a parent company, despite the fact that the parent "implemented a Corporate Integrity Agreement, involving the distribution of a Code of Conduct . . . to all its subsidiaries," which "All employees of [the parent] and its subsidiaries were required to sign and abide by." *Id.* at *7. While *Bastidas* is not a False Claims Act case, it is relevant insofar as it stands for the proposition that "the implementation of a set of 'general policies and procedures' by which subsidiaries must abide is not inconsistent with a corporation's distinct status as a parent." *Id.*

Although the Government never explicitly argues that a parent company's mere awareness is enough to establish FCA liability, it cites one district court case that appears to go beyond the general rule of law as I have articulated it. In *United States ex rel. Schagrin v. LDR Indus., LLC*, 2018 WL 6064699 (N.D. Ill. Nov. 20, 2018) – a decision on a motion to dismiss for failure to state a claim – the Court stated in dictum that a corporate parent could be essentially vicariously liable for its subsidiary's submission of false claims if it "has the unfettered power, not simply to report, but to affirmatively stop fraudulent conduct, and instead affirmatively decides to allow to [sic] the

fraud to continue, and furthermore, then enjoys the resulting corporate profits." *Id.* at *6. Although the Court dismissed the case due to the plaintiff's failure to adequately allege the parent's knowledge of the fraud, the Court reasoned that, "For a person with such power, knowledge of the fraud is sufficient to allege the 'active role' necessary for liability, because the *failure to act* constitutes a course of conduct that proximately causes the fraud." *Schagrin*, 2018 WL 6064699, at *6 (emphasis added).

Defendants argue that *Schagrin* should be disregarded, not because it is an outlier case, but because the facts are distinct from ours, in that "the parent company both 'owned and managed' the subsidiary's operations," which they argue is distinct from the relationship between CVS Health Corp. and Omnicare. *Id.* (citing *Schagrin*, 2018 WL 6064699, at *6). Dkt. No. 746, at 6. But I conclude that *Schagrin* should be disregarded because its reasoning runs contrary to all other case law and so it is not good law on this particular point – which, moreover, was not necessary to the ultimate decision to dismiss, and which can therefore be considered dictum. I decline to adopt its reasoning. More in keeping with the overwhelming majority view is the reasoning of Judge Gibson in *Tyrone Hosp.*, 234 F.R.D. 113, who, in dismissing a corporate parent from an FCA case despite allegations that the parent had failed to respond to internal audits or act on a recommendation from the relator that its subsidiary engage in "self disclosure" of offending conduct, said, "While it may be disturbing to some to find that a management entity who is aware of the illegalities alleged here would not be liable for those illegalities, the [p]laintiffs have not alleged sufficient facts to bring [the parents] into the fold of those who were allegedly submitting false records and claims." *Id.* at 125-26.

CVS Health Corp. also cites *United States ex rel. Polukoff v. St. Mark's Hosp.*, 2016 WL 1449219, at *2 (M.D. Tenn. Apr. 13, 2016) for the proposition that an FCA case against a parent

of a filer can be dismissed on motion (as *Polukoff* was, on a Rule 12(b)(6) motion) despite the existence of a Corporate Integrity Agreement to which the parent was a party. That strikes me as a self-evident proposition. But there are CIAs and there are CIAs, and the CIA in *Polukoff* bears little to no resemblance to the CIA in this case. In *Polukoff*, the Court emphasized that complaint describes how the parent's "current compliance policies still incorporate many of the terms of the Integrity Agreement," but does not "explain how [the parent's] background pertains to Relator's current allegations of Medicare fraud" or "allege any conduct or omissions by [the parent] that are outside the scope of the described compliance policies. *Id.* at *2. Moreover, the CIA had expired years prior to the commencement of the FCA action. In this case, by contrast, the CIA contains a few provisions that even Omnicare identified as being "indirectly" applicable to its issues with cycle fill/rollover and chart orders; and the CIA was in effect during the period that was the subject of Bassan's *qui tam* action. This case strikes me as utterly irrelevant to CVS Health Corp.'s motion.

So, under the law as I understand it, the Government must demonstrate rather more than "mere awareness plus inaction" on the part of CVS Health Corp. in order to get to the jury. But the Government's position is that its evidence meets that standard because it demonstrates that CVS Health Corp. "affirmatively decided to not prioritize the implementation of straightforward fixes, such as permanently turning off the rollover functionality for non-skilled facilities." Dkt. No. 735 at 8. Inconveniently, courts are divided over what more is needed to move a case beyond the level of mere awareness and into the world of "direct participation" by causing the filing of false claims – and there is no case that is quite on point.

### c. An Affiliate's Active Approval or Orchestration of the Underlying Fraud Is Routinely Sufficient to Prove Causation

On the other end of the spectrum from cases in which a corporate parent was "merely aware" of its subsidiary's submission of false claims but failed to act are cases in which the parent

or affiliate was actively approving of or orchestrating the underlying fraud. Sadly, all those cases are unhelpful to an analysis of our situation, because their facts about parental/third-party involvement in the process of presenting claims differ greatly from the facts before us.

Both parties cite *United States v. President & Fellows of Harvard College*, 323 F. Supp. 2d 151 (D. Mass 2004), but the facts in *Harvard College* differ significantly from our own. The three defendants in that case included a parent entity, Harvard University, that directly submitted false claims to the Government, but did so without being aware that those claims were false. The other defendants were two Harvard employees – one who approved expenses directly, and another who did not. Judge Woodlock granted in part defendants' motions for summary judgment dismissing Harvard and the employee who was not involved in approving expenses, while granting the Government's motion for summary judgment against the employee who was involved in approving expenses. *Id.* at *201-02. Although we finally do have a case showing when an affiliate (albeit an employee, not a corporation) can be implicated in another's submission of false claims, this case involves the direct approval of underlying expenses; there are no similar facts in our case. As to the defendants who were dismissed from the case, CVS Health Corp. is substantially distinguishable from defendant Harvard in that, while it submitted no false claims itself (unlike Harvard), there is evidence from which a reasonable jury could conclude that the parent holding company knew that false claims were being submitted.[9] And CVS Health Corp. is distinguishable from the individual employee who was dismissed from the case because, on the Government's reading of the CIA, CVS Health Corp. was both responsible for and capable of ensuring that its subsidiary was in compliance with the False Claims Act.

---

[9] And also from which a reasonable jury could conclude otherwise.

14

Another case, *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235 (3d Cir. 2004), was cited by Defendants for the unremarkable proposition that, "mere awareness that another may, or even has, chosen to make such a claim does not *alone* constitute 'causing a false claim to be presented.'" *Id.* at 245 (emphasis added). But *Zimmer* was not a case of "mere awareness." The Third Circuit reversed a district court's dismissal of the *qui tam* complaint for failure to state a claim, holding that "the District Court erred in concluding that someone other than the actual presenter cannot be responsible under the FCA in the absence of duping." *Id.* at 244. Specifically, the Third Circuit reinstated an FCA case against Zimmer, a manufacturer, seller, and distributor of orthopedic implants, because Zimmer was alleged to have knowingly "created and pursued a marketing scheme that it knew would, if successful, result in the submission by Mercy [a company that provided medical services] . . . of compliance certifications required by Medicare that Zimmer knew would be false." *Id.* There is no analogous evidence suggesting that CVS Health Corp. "created and pursued" any scheme that it knew would or could result in Omnicare's submission of false claims. So once again, that case is of little use in this case.

Similarly, in *United States ex rel. Long v. SCS Business & Technical Institute*, 999 F. Supp. 78 (D.D.C. 1998), *rev'd on other grounds*, 173 F.3d 870 (D.C. Cir. 1999), defendant New York State undertook numerous affirmative actions that enabled a fraud to continue and allowed New York State to receive a portion of the federal funding for which a company managing proprietary schools ("SCS") submitted false and fraudulent claims. These actions included conducting a sham investigation into a limited number of allegations of fraud, crafting a "sweetheart" settlement to conclude the "investigation," and then making affirmative false representations to the federal government about both SCS's compliance with the law and New York State's monitoring of SCS's operations. The complaint in that case alleges numerous facts tending to suggest that New York

State was complicit in SCS's fraud from soup to nuts, and that it participated in the fraud so that it could obtain federal funds under false pretenses. The D.C. Circuit ultimately reversed Judge Emmett Sullivan's decision denying New York State's motion to dismiss, but did so on the ground that the term "person" in the FCA did not apply to states and related Eleventh Amendment concerns that are of no pertinence here. To the extent that the facts of the case are informative, they suggest a degree of involvement far in excess of anything that the Government has alleged against CVS Health Corp. here.

Finally, in *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25 (D.D.C. 2007), Judge Royce Lamberth of the District Court for the District of Columbia denied a motion for summary judgment because there was evidence that the parent company seeking dismissal was directly involved in the process of finalizing the cost report and billing that went to the Government. I cannot think of facts that would be more likely to result in a finding of "direct participation" than these. And there absolutely are no analogous facts in this case – not a scintilla of evidence tending to show that CVS Health Corp. (or anyone wearing that hat) was involved in any way in the preparation of information that Omnicare submitted to the Government in order to obtain reimbursement. So to that extent this case, too, sheds no light on our situation.[10]

In each of these cases, a court determined that a parent or affiliate should remain in an FCA case, based on allegations (in *Zimmer* and *SCS*) or evidence (in *Harvard College* and *Columbia Healthcare*) of the parent or third party's significant and active approval or orchestration of the underlying fraud. I emphasize that the facts in these cases are entirely dissimilar from the facts in the case at bar; rather, they represent the other end of the spectrum from cases of "mere awareness."

---

[10] There are other facts in *Columbia Healthcare* that are more germane to the facts in this case; they will be discussed below (*see infra*, pp. 18-21).

### d.  The Middle Ground

Between these two extremes – cases in which the parent company's "mere awareness" of a subsidiary's conduct was insufficient to demonstrate direct participation in the filing of false claims and those in which a parent or affiliate's approval or orchestration of the underlying fraud was found to demonstrate direct participation – lies cases with varied fact patterns, each of which involved more than "mere awareness" coupled with inaction, but less than active approval or orchestration. Predictably, the outcomes in these cases vary.

Some of these cases involve a parent company inserting itself into the causal chain that resulted in the filing of false claims. In *Exec. Health Res.*, 196 F. Supp. 3d 477, Judge O'Neill of the Eastern District of Pennsylvania, confronted with a motion to dismiss for failure to state a claim, held that FCA claims against a parent company should be dismissed despite allegations about the parent's "marketing and promoting of [the subsidiary's] services — which would allegedly make false certifications of patient admission status for medical clients, who would in turn rely on those certifications to file fraudulent claims with the government." *Id.* at 514. Judge O'Neill explained that this conduct did not constitute "carr[ying] out fraudulent schemes by directly inducing" the submission of false claims. *Id.*

But another case, *United States ex rel. Tyson v. Amerigroup Ill., Inc.*, 488 F. Supp. 2d 719 (N.D. Ill. 2007), which also involved a parent company "actively participat[ing] in the marketing strategies of the [subsidiary] by making suggestions and changes to marketing materials and discussing the marketing materials with [the subsidiary's] CEO," was held to have sufficient evidence in the record to support the jury's finding that the parent actively participated in its subsidiary's fraudulent submission of false claims. *Id.* at 737. In that case, Judge Leinenweber of the Northern District of Illinois cited evidence in the record that the parent and subsidiary worked

17

together on initiatives – including an initiative that was central to the Government's FCA claim – and the subsidiary's executives "reported to [the parent] regarding [the subsidiary's] progress under these initiatives regularly, and . . . [the parent's] employees were very involved in helping [the subsidiary] to develop policy guidelines." *Id.* (internal citations omitted). This evidence is similar to the upstream reporting and circulation and review of internal risk trackers that the Government argues is key to CVS Health Corp.'s participation in Omnicare's submission of false claims.[11]

Here too is where the additional facts in *Columbia Healthcare* might be deemed pertinent. In that case, there was correspondence between the parent and the Government about the subsidiary's claim submission – correspondence that the court described as "a central part in consummating the fraud." *Columbia Healthcare*, 498 F. Supp. 2d at 62. This evidence is not identical to, but can be analogized to, the certification by "CVS Health" (whatever that phrase means) that "CVS Health's IPS Operations" (which all parties agree means Omnicare's operations) were compliant with Section III.E of the CIA. There was also evidence in *Columbia Healthcare* that the parent company "schooled" hospital executives in some of the fraudulent techniques that were used to increase Medicare reimbursement rates. *Id.* at 62-63. That evidence is not identical to, but can be analogized to, evidence that members of the Compliance Team (who may or may not have been acting on behalf of CVS Health Corp.) were aware of both the cycle fill/rollover and chart entry issues and discussed how Omnicare might deal with those issues. It seems fairly

---

[11] There was also evidence in the *Tyson* record that high-level government employees in Illinois did not draw any distinctions between the parent and the subsidiary and that the subsidiary made submissions to the Government on the parent's stationary, which the Government claims is similar to the "blurred lines" between CVS entities in our case. But in my humble opinion, evidence that a Government agency did not draw distinctions between a corporate parent and its subsidiary is entirely irrelevant to the issue of whether the parent directly participated in the submission of false claims, and has nothing to do with whether liability can be imposed on a parent for false submissions made by its subsidiary. Government entities are perfectly capable of making mistakes and erroneous assumptions about matters of corporate form – indeed, that is CVS Health Corp.'s argument in this very case.

clear from reading the opinion that the Court in *Columbia Healthcare* was underwhelmed by the totality of the evidence against the parent; but Judge Lamberth deemed there to be sufficient evidence to deny a motion for summary judgment and send the case to the jury. *Id.* at 63.

This middle "tranche" also includes cases where parent entities failed to respond to internal audits and recommendations that a subsidiary's conduct be corrected. And again, the results are mixed. In *Tyrone Hosp.*, 234 F.R.D. 113 (discussed, *supra*, p. 12), the corporate parent was dismissed despite allegations that it had failed to respond to internal audits or act on the relator's recommendation that its subsidiary "self disclose" offending conduct. In that case, the parent's failure to act, even coupled with knowledge, was deemed insufficient to impose liability. This decision suggests that evidence about compliance "decision makers" within the CVS Health enterprise (though not necessarily at CVS Health Corp.) and their awareness of the problems at Omnicare, couple with their failure to force Omnicare to address the "high priority" identified risks, is not sufficient to keep CVS Health Corp. in the case.

But predictably, there are cases with similar facts going the other way. In *United States ex rel. Martino-Fleming v. S. Bay Mental Health Ctrs.*, 540 F. Supp. 3d 103 (D. Mass. 2021), Judge Patti Saris in the District of Massachusetts denied a motion for summary judgment made by an ultimate corporate parent (a private equity firm). She did so because there was "sufficient evidence in the record that by virtue of its members' participation in [an intermediate company board], [the parent] had the power to fix the regulatory violations which caused the presentation of false claims but failed to do so." *Id.* at 130. In *South Bay*, the Government had introduced evidence that reports were developed identifying compliance issues that were causing the subsidiary to submit false claims, and working groups at the operating company level offered recommendations for how to fix these problems. *See id.* at 110. Judge Saris underscored the fact that the parent, having been

19

made aware that this compliance problem was "still relevant," and arguably having had the power to address the violations causing the presentation of false claims, had nonetheless failed to do anything. *Id.* at 129-30. Whether the ultimate parent had that power was "arguable" at the summary judgment stage, but Judge Saris concluded that there was sufficient evidence in the record of such power. *Id.* at 130.

This fact pattern comes closer than the facts in any cited case to those in this case. Our evidence can be understood to show (i) that CVS Health Corp. had ultimate oversight over Omnicare's compliance with Government program regulations – indeed, was required to do so by virtue of the CIA[12] – (ii) that it was aware of the compliance issues that underlie this case, and the fact that certain fixes had been proposed to remedy them, but (iii) that it opted not to force its subsidiary to adopt those fixes. The Government likens this fact pattern to Judge Saris's description of a "knowing ratification of [a subsidiary's] prior policy of submitting false claims by rejecting recommendations to bring [the subsidiary] into regulatory compliance." *Id.* at 130.

## II.    The CVS Corporate Structure, Alone, Does Not Insulate CVS Health Corp. from False Claims Act Liability

The Defendants' position is not only that the Government has failed to offer evidence of anything more than a corporate parent's "mere knowledge," but that it has failed to demonstrate that CVS Health Corp. was capable of "causing" false claims to be submitted. Defendants argue that, "A corporation only can act through individuals and there is no evidence CVS Health Corporation employs or employed anyone." Dkt. No. 735, at 5.

This refrain can be found in the Defendants' cited cases, but it has been properly held to not be dispositive. For example, in *Columbia Healthcare*, 498 F. Supp. 2d 25, the Court denied a

---

[12] Depending, of course, on how one interprets that agreement (which was between the Government and "CVS Health Corporation and its subsidiaries," not just CVS Health Corporation) and what hat Mr. Falkowski was wearing when he sent his certifications to the Government – an issue of fact that I am sending to the jury.

parent defendant's motion for summary judgment despite the fact that the defendant argued "that [the corporate parent] itself has no employees and that some other corporate entity in the [corporate parent's] family is the proper defendant." *Id.* at 98. That is, of course, the very argument that CVS Health Corp. makes here. The Court in *Columbia Healthcare* recognized that the Government/relator might have sued the wrong corporate party in that case – it said that the defendant had offered a plausible defense in that regard, as indeed CVS Health Corp. has done here – but it refused to rule that this defense was dispositive, because, "even though the corporate distinctions between the two [entities] were still observed," there was a "genuine factual dispute as to whether the [parent] corporate entity itself participated in submitting a false claim or causing one to be submitted, in concert with [the subsidiary]." *Id.* at 98-99.  The same is true in this case.

A holding company with no employees that conducts no business operations is not impotent. Like any other corporation, a holding company such as CVS Health Corp. can act through its officers, directors and agents – persons or entities (even affiliates) who are acting on behalf of the holding company parent to carry out functions that the law imposes on such a parent. As I noted in my summary judgment decision, "it is theoretically possible that if CVS Health [Corp.] carried out an obligation of its own through an employee of a subsidiary, that employee's actions could be attributed to CVS Health [Corp.]." Dkt. No. 671, at 9 n.1. As the Second Circuit has explained, one cannot fail "to account for the mundane ubiquity of lawful agency relationships, in which one person, to one degree or another . . . , acts as a representative of or otherwise acts on behalf of another person." *Great Minds v. FedEx Office & Print Servs.*, 886 F.3d 91, 95 (2d Cir. 2018) (internal citations omitted).

This is not at all to say that corporate parents are responsible for all or even the majority of the acts of affiliates – but CVS Health Corp.'s lack of employees is simply not dispositive. It may

indeed depend on "what hat" a particular actor (the principal actor being Mr. Falkowski) was wearing when s/he or it took some step – his/her/its hat as an officer, director or agent of CVS Health Corp., the hat of his/her corporate employer, or some other hat. There is evidence that the key players here wore multiple hats. Defendants insist that they were never wearing a CVS Health Corp. hat when they took or failed to take particular actions – specifically, that the compliance function for IPS Operations resided in CVS Pharmacy and that responsibility for dealing with identified compliance issues rested with Omnicare itself. The jury is free to credit that evidence; if it does, it will conclude that the Government sued the wrong corporation. And frankly, there is not very much countervailing evidence to tar CVS Health Corp., as opposed to "CVS Health" – a term that the CIA defines to include all of the subsidiaries of CVS Health Corp. and so, without more, fails to make the requisite distinction among corporations that would be required to hold CVS Health Corp. liable under the False Claims Act for false claims filed by Omnicare.[13] For example, there is no evidence that the Board of CVS Health Corp. ever considered, let alone adopted, a resolution refusing to adopt changes to Omnicare's dispensing practices – which would be the most straightforward way of a parent corporation's involving itself in the operations of its subsidiary. But to the extent that CVS Health Corp. rests its motion on corporate formalities, it has an argument – nothing more.

## CONCLUSION

For the foregoing reasons, I am allowing the question of FCA liability as to CVS Health Corp. to go to the jury and reserving judgment on Defendants' motion for a directed verdict. At the

---

[13] This is all the more true because the CIA was undoubtedly drafted by the Government and so ambiguities and uncertainties must be construed against it.

close of all evidence, CVS Health Corp. renewed its motion for a directed verdict, but I am not persuaded to alter my decision to reserve judgment.

Although it should be clear that I believe there is ample evidence to support a reasonable jury's finding that CVS Health Corp. did not directly participate in Omnicare's submission of false claims, I believe the better part of valor is to allow the jury to have the first crack at deciding whether the evidence in the record supports the opposite conclusion. Rest assured, the jury will receive ample guidance on the meaning of "direct participation."

Dated: April 24, 2025

_____
U.S.D.J.

BY ECF TO ALL COUNSEL